Donald K. MILLER and Barbara L. Miller, his wife, Plaintiffs,

v.

E. Edward BARE and Margaret S. Bare, his wife, Defendants.

Civ. A. No. 77–228.

United States District Court, W. D. Pennsylvania.

Oct. 12, 1978.

George Hoffman, Pittsburgh, Pa., for plaintiffs.

David K. McMullin, Pittsburgh, Pa., for defendants.

## OPINION

SNYDER, District Judge.

Plaintiffs, residents of Hampton Township, Pennsylvania, brought this action against the Defendants, who are residents of Canfield, Ohio, for compensatory and punitive damages for injury resulting from misrepresentation by Defendants of the boundaries and condition of property they sold to Plaintiffs. Jurisdiction is founded on diversity of citizenship, 28 U.S.C. § 1332.

## FINDINGS OF FACT

On December 29, 1972, E. Edward Bare and Margaret S. Bare, his wife, became the owners of two contiguous tracts of land in Hampton Township, Allegheny County, Pennsylvania, composed of Lot Number 5 in the Royal Crest Plan of Lots, dedicated and of record in the Recorder's Office of Allegheny County, and of an adjacent tract containing .63 acres.

On June 9, 1976, the Bares conveyed these same two tracts to Donald K. Miller and Barbara L. Miller, his wife, along with the house erected on the lot and a swimming pool to the rear within the adjacent area, for consideration of $95,000.00. A portion of the .63 acre tract was enclosed with a fence, as required by a township ordinance.

In late April or early May, 1976, the Millers learned that the Bares' property was for sale by Northwood Realty Company and Barnhardt Realty Company. The Millers made several visits to the property. Mrs. Miller toured the house and grounds first with Sandra Tupper, and, at the time, asked Edward Bare whether he owned the property inside the fence and a flat, mowed rectangular piece immediately to the south of the fence and was told by him that he did. On a third visit, which the Millers made together to inspect a right-of-way and paper street on the property, Edward Bare again indicated that he owned the area within the fence and the parcel just beyond it to the south, and, on hearing of Donald Miller's interest in gardening, told him that the area beyond the fence was once used as a garden and could be used for gardening by the Millers. The entire area Edward Bare represented as part of his property was being maintained by him. Both Donald and Barbara Miller testified that the size and beauty of the property surrounding the house and swimming pool were a major part of their decision to buy from the Bares; there is no serious dispute as to the materiality of the representation of boundaries or the fact that the Millers relied on it in deciding to buy from the Bares.

With the help of a Northwood Sales Agent, the Millers signed a "Standard Agreement of Sale" form offering $95,000 for the property "contingent upon the Buyers receiving a report from the National Home Inspection Service by June 13, 1976 that said property is in condition satisfactory to Buyer." The Agreement also stated that "[i]f not satisfactory, Buyer shall so notify Seller and the agreement shall terminate and the hand money returned forthwith." When this proposed agreement was presented to the Bares, the Bares refused to sign because of the contingency clause. The contingency was stricken, the agreement taken back to the Bares, and the Bares then approved.

While the testimony is somewhat conflicting, the Court finds that when the agreement was first taken to the Bares, the selling agents, Sandra Tupper and Don Pohlig, specifically inquired of them whether or not there were any major construction or maintenance problems with the premises and were assured that there were none. The agents then transmitted this information to the Millers, who then agreed to the elimination of the contingency clause.

Neither the sellers nor the buyers had a survey of the premises prepared, and none was procured until after the closing, which, on the insistence of the Bares, was held within two weeks of the signing of the "Sales Agreement". When a survey prepared by Henry Martone was received on June 24, 1976, it clearly showed that the Bares had not transferred all of the property within the fence lines or the piece beyond the fence, and, in fact, they never had title to all of the area. The total area of the "unowned" piece is approximately 7,000 square feet. The Court finds no evidence of an intention on the part of Edward Bare to mislead the Millers as to the size or boundaries of the property. Apparently, the boundaries Edward Bare represented to the Millers were the same ones that the Bare's grantor, William P. Cornelius, had pointed out to them when they purchased the property. The description of the property in their deed from Cornelius is identical to the description in their deed to the Millers.

Very shortly after the Millers received title to the property, their son moved into the house in order to protect it while Donald Miller did various minor repair and maintenance work preparatory to moving in. During this period, the Millers discovered a fairly large area along the north wall of the recreation room, which had previously been covered up by a work bench that was removed by the Bares when they left the premises, which had stain marks of some duration and where the paneling and coving were rotting and coming loose from the wall. In a heavy rain, water flows through this part of the wall to an average depth of one inch until it reaches an outside drain. The Millers later found some v-shaped troughs on the outside of the house, which Bare admits he used to conduct the roof water away from the walls by connecting these extensions to the down spouts from the roof, which did not go into drains or sewer lines, but were extended out onto the ground.

After the closing and before he left the house, Edward Bare was informed by Lawrence R. Hopper of Peoples Natural Gas Company that the gas line from the house to the heater in a small structure near the swimming pool had a leak. Hopper closed the line and told Bare it was not installed in compliance with the Gas Company regulations. Bare called Donald Miller and told him about the leak.

## DISCUSSION AND CONCLUSIONS OF LAW

■ Although we have determined that Edward Bare's misrepresentations concerning the boundaries of the property were innocently made, this does not bar the Millers from recovering damages for the injury they have sustained. It is now well established in Pennsylvania that an innocent misrepresentation of a material fact by a vendor that is justifiably relied on by a purchaser is a basis for rescission of a contract for sale of land. The court in *LaCourse v. Kiesel*, 366 Pa. 385, 77 A.2d 877, 879–80, held that purchasers could rescind their agreement to buy real property and recover

their deposit, when they discovered that the property, advertised as "splendid for apartments, which would bring in a handsome income in addition to providing beautiful living quarters for the owner," was zoned for single family dwellings only. The court explained their reasons for imposing liability as follows:

"Moreover, whether the auctioneer or the owners *knew* that the representation was false has been repeatedly held in this jurisdiction to be a matter of no consequence. A vendor has no right to make such a statement of which he has no knowledge: *Braunschweiger v. Waits,* 1897, 179 Pa. 47, 36 A. 155; *Jack v. Hixon,* 1903, 23 Pa.Super. 453, 446; 3 Pomeroy's Equity Jurisprudence, 5th ed., sec. 889. So also we have repeatedly held there is no obligation on the part of the purchasers to examine public records before purchase: *see Lake v. Thompson,* 366 Pa. 352, 77 A.2d 364; *Merritz v. Circelli,* 1949, 361 Pa. 239, 64 A.2d 796, 7 A.L.R.2d 1325; *Suraci v. Ball,* 1947, 160 Pa.Super. 349, 51 A.2d 404."

\* · \* \* \* \* \*

"A material misrepresentation of an existing fact confers on the party who relies on it the right to rescind whether the defendants here actually knew the truth or not, especially where, as here, they had means of knowledge from which they were bound to ascertain the truth before making the representation. Misrepresentations made under such circumstances *are* fraudulent and have been variously called implied, constructive or legal fraud or fraud in Equity: *see* 37 C.J.S. Fraud § 2 pp. 209 and 214; 3 Pomeroy's Equity Jurisprudence, 5th ed., p. 482 and p. 489; but even where innocently made, if material, are nevertheless grounds for rescission: Restatement, Contracts, sec. 476, comment b."

In *Dunsmore v. Criville,* 34 Pa.D&C2d 337 (C.P.Mont.1964), the vendor represented to the purchaser that there was an elaborate sewage system on the property he was selling. An investigation after the agreement of sale revealed that the system extended ten feet into the adjoining property of another owner. Although the court conceded

the representations "were not fraudulently made", it allowed rescission.

Although strict responsibility for innocent misrepresentation is long familiar as a reason for granting equitable remedies, and, as noted above, has been adopted in Pennsylvania, traditionally a deceit action for damages would fail absent proof of scienter. *Derry v. Peek,* 1888, 14 A.C. 337; Prosser, *Torts,* § 107. As a result, some courts have been reluctant to allow damages barring an intent to deceive. 37 C.J.S. *Fraud* § 4, p. 219. Nevertheless, both logic and the trend of the law support allowing damages in such circumstances.

Restatement (Second) of Torts § 552C, adopted by the American Law Institute in 1976, provides that:

"Misrepresentation in Sale, Rental or Exchange Transaction

(1) One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

(2) Damages recoverable under the rule stated in this section are limited to the difference between the value of what the other has parted with and the value of what he has received in the transaction."

As the comments to this Section indicate, many courts have "held that an unqualified statement of fact, which is susceptible of personal knowledge and which turns out to be false, is fraudulent insofar as there was no disclaimer of personal knowledge." Restatement, *supra,* Comment a.

As the Supreme Court of Pennsylvania stated in *Shane v. Hoffman,* 227 Pa.Super. 176, 324 A.2d 532, 536 (1974), scienter "may be either actual knowledge of the truth or falsity of the representation, reckless ignorance of the falsity of the matter, or mere false information where a duty to know is imposed on a person by reason of special circumstances."

Pennsylvania has imposed such an absolute duty to know on owners of property in regard to statements they make about their property in connection with a contract of sale. As the Superior Court stated in *LaCourse v. Kiesel, supra,* 77 A.2d at 879, "the owners [of the real estate] were bound to know what the [zoning] restrictions provided."

Since there is no Pennsylvania case law expressly adopting Section 552C or otherwise directly on point, it is our task to predict what action Pennsylvania courts would take if faced with the case before this Court. *Samuelson v. Susen,* 576 F.2d 546, 551 (3rd Cir. 1978); *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.,* 499 F.2d 146, 147 (3rd Cir. 1974). The Court of Appeals for the Third Circuit has indicated on a number of occasions that the Federal courts may adopt the Restatement position in the absence of state authority, if it is consistent with the existing case law in the area. *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781 (3rd Cir. 1978); *Chuy v. Philadelphia Eagles Football Club,* Nos. 77–1411 and 77–1412 (3rd Cir. March 16, 1978); *Keystone Aeronautics Corp. v. R. J. Enstrom Corp., supra.* In the past, Pennsylvania courts have frequently looked to the American Law Institute's Restatement of Law for guidance in resolving novel issues of law or as a basis for the development of the law. *See, e. g., Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966) (adopting Section 402A of the Restatement (Second) of Torts); *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 327 A.2d 94 (1974) (adopting Section 328C of Restatement (Second) of Torts).

We believe that the Restatement position embodied in Section 552C is in keeping with the trend of Pennsylvania law. The Pennsylvania Supreme Court in one early case fashioned a non-equitable remedy in a case of mutual mistake. In *Blygh v. Samson,* 137 Pa. 368, 20 A. 996 (1891), a vendor mistakenly represented that he owned all the timber within certain boundary lines, which he pointed out to the purchaser of the timber. The lower court found that the boundaries as indicated were incorrect and that one-third of the timber represented by

the vendor as being on his property was, in fact, outside the boundaries of his land. On the basis of these findings, the Supreme Court held that the purchaser could deduct a proportionate share of the amount due the vendor on the contract, stating (137 Pa. at 377, 20 A. at 997):

"A contract entered into in a mutual mistake as to an essential fact which formed the inducement to it, may be rescinded on discovery of the mistake, if the parties can be placed in their former position with reference to the subject-matter of it; but if this is not possible, by reason of something done under the contract before the mistake was discovered, the injured party may have compensation in damages as an equitable defence to an action on the contract, or to be recovered in a suit for them."

More recently, Pennsylvania courts have held that when an individual states as true something about which he is totally ignorant and that statement turns out to be false, he can be liable for damages. *Kelly v. Herrington,* 191 Pa.Super. 361, 156 A.2d 601 (1959); *Polaski v. Levin,* 176 Pa.Super. 370, 107 A.2d 876 (1954) (dictum). The Supreme Court of Pennsylvania has also allowed damages for negligent misrepresentation. *Rempel v. Nationwide Life Insurance Co.,* 471 Pa. 404, 370 A.2d 366 (1977) (citing Restatement of Torts § 552). The trend toward the expansion of liability for innocent misrepresentation in Pennsylvania is also reflected in Pennsylvania's adoption of Article 2 of the Uniform Commercial Code, which allows damages for innocent misrepresentations, although the measure of damages allows recovery for the loss of bargain and is subject to contract defenses, such as the parole evidence rule. 12A P.S. § 2–313; Restatement (Second) of Torts, § 552C, Comment b.

The official comments to Section 552C trace the development of the law regarding actions for innocent misrepresentations:

"a. *History.*

\*  \*  \*  \*  \*  \*

More significantly, other courts have utilized the rule originating in equity that

when a party seeks rescission of a transaction on the ground of a misrepresentation of a material fact by the other party relief will be granted even though the misrepresentation was innocent (just as rescission is also granted for mutual mistake). (See, generally, Restatement of Restitution, §§ 6, 8; Restatement, Second, Contracts §§ 304, 306). This rule of law of restitution has also been regularly applied in actions at law, at least in situations in which the plaintiff is seeking to recover money paid and has already effected a rescission, so that a decree establishing the rescission is not required. (See Restatement of Restitution, § 28). Under similar circumstances a number of courts have permitted a tort action for damages without regard to the requirement that the transaction be completely rescinded, either by the plaintiff or by the court, and without limiting the action to the restitutionary concept of recovery of money paid.

b. *Relationship to action for restitution or breach of warranty.* The remedy provided in this Section is very similar to that afforded under the law of restitution. It differs, however, in a material respect. The plaintiff is permitted to retain what he has received and recover damages, rather than rescind and seek restitution, in which case he must return what he received. The tort action for damages may have a definite advantage to the plaintiff in cases in which he is unable to restore what he received in its original condition; when he has made improvements or for other reasons finds it desirable to keep what he has received rather than return it; when he is barred from rescission by delay or has so far committed himself that he has lost the remedy by an election; or when for some other reason, such as the defendant's change of position, restitution is not available to him. It may even in many cases be a better solution from the point of view of the defendant himself, since it permits the transaction to stand, rather than be upset at a later date."

The parties here agree that the proper measure of damages for fraud in Pennsylvania and, therefore, in this case, is the "out-of-pocket" rule, which allows the purchaser to recover the difference between the purchase price and the actual value of the property at the time of the transaction. *Kaufman v. Mellon National Bank and Trust Co.,* 366 F.2d 326 (3rd Cir. 1966); *Tilghman v. Dollenberg,* 418 Pa. 604, 213 A.2d 324 (1965). The effect of this rule, as opposed to the so-called "benefit of the bargain" principle, is to return the parties to the same position they were in before the transaction, and thus is equivalent to rescission. This comports with Restatement (Second) of Torts § 552C(2), Comment b and the Restatement of Restitution § 28, which is the seedbed of recent developments in this area. In addition, allowing damages in this case is by far the mildest remedy available, causing the least disruption and hardship to the parties. *See* Dobbs, *Remedies* § 92, pp. 608–10; Restatement (Second) of Torts § 552C(2), Comment b. In *LaCourse v. Kiesel, supra,* the Superior Court styled the conduct of the defendants in making unintentionally false statements concerning their property constructive or legal fraud. The court's opinion in that case reflects a strong public policy against allowing a person who has ready access to information about real estate to make a statement about it and then to claim "he did not know what he should have known," and holds such persons to what is in effect a standard of strict liability. 77 A.2d at 881. It would hardly serve that policy to allow the full burden of the loss here to fall on the Millers simply because they do not choose once again to pull up roots and find a new place to live.

Defendants' counsel argues strenuously that the Court can not consider Plaintiffs' allegations concerning Defendants' representation of boundaries because the representations did not appear in the written contract, which contained a merger clause. Citing *Bardwell v. Willis Co.,* 375 Pa. 503, 100 A.2d 102 (1953), he argues that only if the representations were omitted from the written agreement by fraud, accident or mistake, can Plaintiffs show that the representations themselves were fraud-

ulent. Since *Bardwell,* however, Pennsylvania courts have distinguished actions for misrepresentation from contract actions and have allowed testimony regarding fraud despite the parole evidence rule. *Rempel v. Nationwide Insurance Co., supra.* Also see *Sunseri v. RKO-Stanley Warner Theatres, Inc.,* 248 Pa.Super. 111, 374 A.2d 1342 (1977) and the cases cited therein. As already noted, Plaintiffs have brought an action for misrepresentation and seek the more limited damages that attend fraud actions rather than a remedy based on the contract. Therefore, the testimony of Plaintiffs is admissible.

The report of R. M. Douthett of Douthett's Appraisal Service is the only evidence before the Court of the value of the property described in the deed to the Millers at the time of the conveyance to them. Douthett estimates that the value of the property at that time was $90,000. The Millers paid the Bares $95,000, and, therefore, may recover $5,000 on their action for misrepresentation of the boundaries.

In contrast to his representations concerning the boundaries of his property, Edward Bare's statement that there were no major problems with the property, made to the Millers by way of Tupper and Pohlig, was a deliberate attempt to mislead the Millers as to the condition of the house. In *Borelli v. Barthel,* 205 Pa.Super. 442, 211 A.2d 11 (1965), the purchasers of a house alleged that the vendors told them the house "was in A–1 condition and needed no repairs." While inspecting the premises, the purchasers observed only three floor posts in the basement supporting the upper floors and were told that the plaster board which covered the floor joists was installed only to improve the appearance of the ceiling. When they returned to the house after settling for the property and receiving the deed, the purchasers discovered six floor posts in the basement instead of three, and after removing the plaster board from the ceiling, they found that the floor joists were infested with termites. The Superior Court held that these allegations, if proven, would support a cause of action for deceit because the misrepresentations concerning the condition of the premises were knowingly made, material, and justifiably relied on by the purchasers to their detriment. The court also held that the doctrine of caveat emptor was not applicable since the truth or falseness of the vendor's statement could not be readily determined by the buyers. *See also, DeJoseph v. Zambelli,* 392 Pa. 24, 139 A.2d 644 (1958) (rescission); *Lake v. Thompson,* 366 Pa. 352, 77 A.2d 364 (1951) (rescission).

The situation before us is analogous to the *Borelli* case. Bare himself characterized Donald Miller as a cautious man and he realized clearly that the water problem in the recreation room might affect the Millers' decision on buying the property. When asked by Don Pohlig whether there was anything major wrong with the house, Edward Bare replied that there were holes in some of the screens and a leaky faucet. Regardless of how minor Edward Bare thought the water problem in the recreation room was, he could not have regarded it as being less important than the screens or faucets. Nor could the Millers have discovered the problem on their own, since the weather was dry when they were inspecting the house and the damage from prior flooding was concealed by the work bench. Therefore, we conclude that Edward Bare deliberately concealed the water problem and misrepresented the condition of the house in order to induce the Millers to buy the property.

Victims of fraud may elect to recover damages for deceit as compensation for the loss they have suffered. *Associated Hardware Supply Co. v. Big Wheel Distributing Co.,* 355 F.2d 114 (3rd Cir. 1966); *Tilghman v. Dollenberg, supra.* In this case, the Millers seek damages in the amount necessary to repair the drainage system in order to prevent further flooding. The testimony of Defendants' expert witness as to the cost of doing so was highly speculative. At the time the Millers discovered the water problem, J. E. Krajovic, Vice President of Mariani & Richards, Inc., made an inspection and provided them with an estimate that repair of the downspouts and waterproofing of the house would cost

$3,110.00. A detailed breakdown of the estimate, based on notes Krajovic made in 1976, was provided to the Court. Plaintiffs' Exhibit 13. We find that this is a reasonable basis for recovery, and, therefore, will award damages to the Millers in that amount in connection with this intentional misrepresentation. No damages will be allowed, however, on the gas line claim since the Bares were not aware of its defective condition themselves until after the closing had taken place.

■ Defendants' counsel argued that regardless of any liability which Edward Bare may incur for his misrepresentations, his wife, Margaret, cannot be held liable. Under Pennsylvania law, there is a presumption with respect to property held by the entireties that either spouse has the power to act for both without specific authority, so long as the benefits of such action inure to both. *J. R. Christ Construction Co. v. Olevsky,* 426 Pa. 343, 348, 232 A.2d 196, 199 (1967). The effect, then, is that Edward Bare was acting as a principal and as his wife's agent in selling the Sample Road property. Margaret Bare's liability, therefore, is to be determined under traditional notions of agency law. The general rule is that a principal is liable for his agent's misrepresentations made within the scope of his authority even though amounting to fraud and deceit. Pennsylvania, however, has not followed this rule. Proof of scienter on the part of the principal at the time of the misrepresentation is an essential element under Pennsylvania law to hold the principal on fraud and deceit practiced by his agent. *Littler v. Dunbar,* 166 Pa.Super. 271, 70 A.2d 365, *rev'd on other grounds* 365 Pa. 277, 74 A.2d 650 (1950); *Shane v. Hoffmann,* 227 Pa.Super. 176; 324 A.2d 532 (1974).

> "A principal, is not, therefore liable for his agent's false representations where he has not authorized nor participated in them nor knowingly permitted the agent to make them."

*Shane v. Hoffmann, supra,* at 537.

■ The facts in this case, however, clearly distinguish it from the *Littler* decision in which the Pennsylvania rule was enunciated. In *Littler,* a sales agent showed the property to the plaintiff buyer without the actual knowledge of or notice to the defendant seller. Margaret Bare, on the other hand, was present when her husband indicated there were no major problems with the house. Mrs. Bare was well aware of the drainage problem hidden by the work bench, and thus, by her silence, "participated" in the fraud perpetrated by her husband.

■ Margaret Bare's liability for her husband's misrepresentation of the boundary line may be less apparent but has nonetheless been established. Her testimony was that she had thought she and her husband owned all the land represented by Edward Bare. Surely, she was aware that her husband was pointing out these boundaries to prospective buyers. Under the facts then, Margaret Bare "authorized", "participated in", or "knowingly permitted" Edward Bare's representations as to the boundary lines. Margaret Bare did not know that these statements were false representations. In fact, this Court has found that neither Edward nor Margaret Bare were aware of the actual boundary lines. However, Mrs. Bare was a landowner, and the teaching of *LaCourse v. Kiesel, supra,* is that landowners are bound to know basic facts concerning their property. This Court therefore holds that there is sufficient proof of scienter on Mrs. Bare's part to hold her for the fraud and deceit of her husband, E. Edward Bare.

Thus, both E. Edward Bare and Margaret Bare will be liable for the damages awarded hereinabove on the claims of misrepresentation of the boundaries and the condition of the house relative to the water problem.

■ The question of punitive damages and counsel fees, which were claimed in the Complaint, is not before the Court, since neither was claimed in the Plaintiff's Pretrial Statement, Supplemental Pretrial Statement, nor at the Pretrial Conference.

## ORDER

AND NOW, to-wit, this 12th day of October, 1978, after non-jury trial and due con-

sideration of the evidence presented, the arguments and briefs of counsel, and for the reasons set forth in the Opinion filed herewith,

IT IS ORDERED, ADJUDGED AND DECREED that judgment be and the same is hereby entered in favor of the Plaintiffs, Donald K. and Barbara L. Miller, his wife, and against the Defendants, E. Edward Bare and Margaret E. Bare, his wife, in the sum of $8,110.00.