Martin SHULMAN & Harry Shulman

v.

CONTINENTAL BANK.

Civ. A. No. 79–2161.

United States District Court,
E. D. Pennsylvania.

May 8, 1981.

Robert H. Levin, Adelman & Lavine, Philadelphia, Pa., for plaintiff.

Leonard Dubin, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for defendant.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

This lawsuit arose out of a loan agreement between the plaintiffs, Martin and Harry Shulman, and the defendant, Continental Bank. In the complaint, consisting of five counts, plaintiffs allege claims for violations of the Bank Holding Company Act, 12 U.S.C. § 1971 *et seq.*, breach of contract, unjust enrichment, fraudulent misrepresentation and punitive damages. The defendant bank has moved for summary judgment pursuant to Fed.R.Civ.P. 56. I have determined that genuine issues as to material facts exist as to Counts II, III, IV and V, so I will deny the defendant's motion on these claims. Regarding Count I, however, there are no material facts in dispute, and defendant is entitled to summary judgment on that claim as a matter of law.

While some important facts remain in dispute, the general factual history of this case can be summarized as follows. For many years, plaintiffs and Shulman Transport Enterprises, Inc. ("STE"), a company in which plaintiffs were the controlling shareholders, officers and directors, were customers of the defendant bank. STE received its principal financing from Conti-

nental. Initially the loan arrangement between the company and the bank was on an unsecured basis. On March 9, 1977, however, STE and Continental entered into an agreement which established a two year revolving line of credit which was not to exceed the lesser of $6,500,000.00 or 75% of the value of all accounts receivable not more than 90 days overdue of STE and its eight domestic subsidiaries. This loan was secured by all accounts receivable, equipment, inventory, contract rights and general intangibles of STE and its domestic subsidiaries. STE was also indebted to the Prudential Life Insurance Company of America pursuant to a note purchase agreement dated August 12, 1969. In an Intercreditor Agreement, dated May 6, 1977, Continental and Prudential agreed to share all collateral of STE and its subsidiaries, their shares to be based on the amount of principal indebtedness owed to each of them.

For many years a very profitable operation, STE suffered significant financial losses in 1976 and 1977. As a result, by June, 1977, the company required additional financing. The March 9, 1977 loan agreement was amended to increase the line of credit by $750,000.00 to an aggregate of the lesser of $7,250,000.00 or 75% of the accounts receivable eligible under the formula set forth in the original agreement. The amendment, dated June 24, 1977, also required STE to provide additional security in the form of a first mortgage on some Massachusetts real estate and security interests in all the accounts receivable, inventory, contract rights and general intangibles of STE's nine foreign subsidiaries.

The fortunes of STE continued to decline, and in February of 1978, STE approached Continental Bank about an additional loan. The bank, however, refused to advance additional funds unless STE first received a substantial amount of capital from another source. Attempting to find other sources

of financing STE asked its largest creditor, American Airlines, for a loan. In a March 22, 1978 meeting attended by representatives of STE, Continental and American Airlines, the terms of a proposed $1,500,-000.00 loan were discussed. If American would loan the $1.5 million to STE, the bank would allow STE to give security to American in the form of accounts receivable over ninety days old and two parcels of real estate.[1] American Airlines refused to make the loan.

Unable to find another source of funds, plaintiffs Martin and Harry Shulman asked the president of Continental, Roy Peraino, if the bank would be willing to make an additional loan to the STE if they personally were to make a substantial loan to the company. The Shulmans and Continental subsequently entered into a loan agreement; this agreement is the subject of the instant litigation. Even a cursory reading of the briefs submitted in connection with this motion reveals disagreement about both the terms of this loan agreement and whether or not the parties have performed under those terms.

The complaint alleges that the Shulmans and Continental entered into a contract whereby the Shulmans agreed to put up $1.3 million, which would be used to purchase a junior participation in the bank's existing loan to STE, and STE agreed to put up additional collateral in the form of two pieces of real estate in consideration for which the bank would loan STE an additional $1 million. It is undisputed that on March 30, 1978, representatives of Continental met with Harry and Martin Shulman to negotiate the loan agreement. The parties also agree that on April 11, 1978, they signed a document entitled "Junior Participation and Subordination Agreement" ("J.P.A.") and that on May 8, 1978 the representatives of the bank and of STE signed a document entitled "Second Amendment to the Loan and Security

---

1. Under the original loan agreement, STE could not encumber any of its assets without first     receiving Continental's consent.

Agreement ("Second Amendment")."[2] According to plaintiffs, these two documents, the J.P.A. and the Second Amendment, "when read together, evidence the Contract". (p.2, Plaintiffs' first Post-Argument Memorandum). Plaintiffs assert that while both STE and they performed their parts of the contract, Continental, despite repeated demands from STE, has never loaned STE any portion of the $1 million.

Defendant disputes plaintiffs' characterization of the contract. It is Continental's position that the J.P.A. and the Second Amendment set forth clearly and unambiguously the terms of the agreement.[3] Those documents show, according to defendant, that plaintiffs indeed agreed to provide STE $1.3 million via a participation in Continental's existing loan to STE, but the bank's obligation to provide the additional $1 million to STE did not arise unconditionally. Continental claims that under the agreement several conditions had to be fulfilled before the bank was obligated to make available the $1 million. First, the Shulmans had to provide all of the $1.3 million; according to the bank, the last payment was not made by plaintiffs until June 12, 1978. A second condition of the loan agreement, according to Continental, was that STE had to ask the bank for the money. The bank alleges that neither STE nor any of its subsidiaries ever made such a request after June 12, 1978. Continental further contends that even if the company had made a request, under the agreement, the bank did not have to honor the request because STE did not have sufficient collateral as required by the accounts receivable formula.

According to defendant, the Second Amendment incorporates the accounts receivable formula set forth in both the original loan agreement and the first amendment except it extends the potential line of credit from $7,250,000.00 to $8,250,000.00 and changes the applicable percentage of accounts receivable from 75% to 85%. While it is never stated directly, the bank's position appears to be that it was committed on receipt of the 1.3 million participation from plaintiffs to loan to STE the lesser of $8,250,000.00 or 85% of the company's accounts receivable less than ninety days old. Continental has submitted an affidavit of Edward V. Caruso, an executive vice-president of Continental Bank, which states that a collateral statement given the bank by STE on June 15, 1978 showed that as of May 27, 1978, 85% of the accounts receivable available for collateral amounted to $5,534,028.00 while the outstanding loan was in the amount of $5,250,000.00. Similarly, according to a STE collateral statement submitted to the bank on July 21, 1978, 85% of the relevant accounts receivable was $5,206,820.00 while the outstanding loan to the company was $5,250,000.00. Given these figures, defendant argues, even if STE had made the proper requests it would not have been entitled to receive any of the $1 million loan commitment.

Plaintiffs dispute the claims of Continental in several respects. First, the Shulmans deny that the bank's obligation to loan the $1 million was tied to an accounts receivable formula. Indeed, plaintiffs argue that the language of the Second Amendment shows that the $1 million was part of a $2 million loan tied to fixed assets and was not dependent on accounts receivable collateral.[4] Alternatively, plaintiffs assert that

---

**2.** The Second Amendment was an amendment to the loan agreement between STE and Continental entered into on June 7, 1977.

**3.** Continental also contends that two other documents support their claims about the terms of the agreement: STE's quarterly report on Form 10–Q for submission to the Securities Exchange Commission for the period ending April 1, 1978 and STE's financial report for the year ending 1977, prepared by Touche, Ross.

**4.** Paragraph 2.1.6. of the Second Amendment states in relevant part:

Bank shall have received written consent to the Second Amendment to this Agreement from the Prudential Insurance Company of America in the form and substance satisfactory to Bank; the Bank shall simultaneously with the execution hereof and of all instruments or documents necessary or in the opinion of Bank proper to effectuate the intention

even assuming that the accounts receivable formula applied, they in fact made their last payment on May 12, 1978 when Harry Shulman pledged to the bank common stocks and bonds worth $725,000.00 as payment for the remaining $412,000.00 owed.

Plaintiffs also dispute defendant's claims regarding the applicable collateral statements for determining loan availability. As the Shulmans point out, defendant has not identified any provision in the loan agreements which states which collateral statement will govern loan availability at any given time. Continental argues that the July 21, 1978 collateral statements prove that STE was not entitled to any of the additional $1 million loan while plaintiffs argue that the collateral statements of May 1, 1978, May 23, 1978 and June 15, 1978, showing loan availability in the amounts of $793,619.00, $675,087.00 and $284,028.00 respectively, establish that the bank was required to make available part of the $1 million.

I turn now to an analysis of the issues raised by the instant motion. The standards governing a motion for summary judgment are well settled; however, a few observations about those principles bear repeating here. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party carries the initial burden of establishing that there is no genuine issue of material fact, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970), and all inferences from the evidence must be drawn in favor of the party opposing the motion. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir. 1980). Further, summary judgment is not appropriate if there is "the slightest doubt" concerning the material facts. *Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir. 1974). Viewing the record in this case in light of these precepts, I find that the plaintiffs, the parties opposing the motion, have identified material facts which are in dispute, precluding summary judgment on the claims for breach of contract, unjust enrichment, fraudulent misrepresentation and punitive damages.

## THE BANK HOLDING COMPANY ACT CLAIM

Plaintiffs Martin and Harry Shulman allege that the defendant bank violated Section 1972(1)(C) of the Bank Holding Company Act (the "Act") when it required them to provide $1.3 million, in the form of a junior participation in the bank's loan to STE, as a condition for extending further credit to the company.[5] In response, defendant asserts that it did not require plaintiffs to enter into a junior participation agreement but rather conditioned any additional loan on STE's first obtaining substantial capital from another source. Continental maintains it never asked the Shulmans to put up

---

of the parties hereto, lend and re-lend to Borrower from time to time before April 1, 1980, such sums, in multiples of $100,000 as Borrower may request, not exceeding in the aggregate (in addition to the sum of $1,300,-000) $2,000,000 with respect to all tangible assets of Borrower (including without limitation, all machinery, furniture, fixtures, equipment, inventory, and the property mortgaged by the Massachusetts, Maryland and Michigan Mortgages, as defined in the Second Amendment to this Agreement), and the Certificates of Convenience and Necessity in which a security interest was granted to Bank by Drake; and the lesser of $6,250,000 or eighty-five (85%) percent of the sum of all

eligible accounts receivable of Borrower and its domestic sureties which means accounts receivable not more than ninety (90) days overdue.

5. Section 1972(1)(C) states:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing on the condition or requirement

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to or usually provided in connection with a loan, discount, deposit or trust service . . .

their own money but that the Shulmans decided themselves to provide the additional money. Moreover, it is the bank's view that a requirement that a potential borrower acquire capital from other sources is not an unusual banking practice, and therefore, as a matter of law, this case does not involve a violation of Section 1972(1)(C) of the Bank Holding Company Act. Having examined the relevant portion of the Bank Holding Company Act, 12 U.S.C. § 1972(1)(C), and the facts presented by this case, I cannot discern any violation of the Act for which Martin and Harry Shulman are appropriate plaintiffs.

■ The underlying purpose of the Act is to prevent the use by a bank of its economic power to lessen competition or to engage in unfair competitive practices. *B.C. Recreational Industries v. First National Bank of Boston*, 639 F.2d 828 (1st Cir. 1981). Section 1972(1)(C) is directed specifically at prohibiting banks from imposing unusual tying arrangements upon their customers. *Freidco Wilmington Delaware Ltd. v. The Farmers Bank of Delaware*, 499 F.Supp. 995, 1001 (D.Del.1980). As the following discussion will establish, this case does not involve such a tying arrangement.

■ Parsing the language of § 1972(1)(C) reveals that the section bars a bank from extending credit, leasing or selling property or furnishing a service to a customer on the condition that the customer provide the bank with some credit, property or service not usually required. An analysis of the transaction at issue here, the junior participation agreement, shows that it does not fall within the purview of this portion of the statute. By the J.P.A., Martin and Harry Shulman agreed to buy a participation in Continental's loan to STE for $1,300,000 in consideration for which the Shulmans received a security interest, subordinated to the interests of Continental

and of Prudential, in various assets of the corporation. In addition, the J.P.A. provided that the Shulmans would receive interest on their participation "but only to the extent that such interest on such participation is actually collected from the Borrower [STE]." (¶ 3, p.3. J.P.A.). A further consideration for plaintiffs' loan participation was that Continental would loan additional monies to STE.

It is clear that the J.P.A. does not amount to either an extension of credit by Continental to Martin and Harry Shulman or the sale or lease of property by the bank to them. Under the terms of paragraph (1) of Section 1972, it may qualify as a service furnished by the bank to the Shulmans. However, the J.P.A. does not tie the furnishing of this service to any requirement, unusual or otherwise, of the Shulmans. Under the J.P.A., the Shulmans are not required to "provide some additional credit, property, or service to [Continental], other than those related to or usually provided in connection with a loan, discount, deposit or trust service." 12 U.S.C. § 1972(1)(C).

The Shulmans have stated their action against Continental under the Bank Holding Company Act from the perspective of STE. That is, they allege that the increased loan to STE was predicated on their purchase of the junior participation agreement and that this constitutes an unusual requirement for a loan and therefore violates the Act. However, such a claim, if it exists at all, belongs not to the Shulmans personally but to the corporation which in November of 1978 was adjudicated a bankrupt under Chapter XI of the Bankruptcy Act. In short, the Shulmans have not adequately stated a violation of the Bank Holding Company Act on their own behalf, and they lack standing to bring the action framed in Count I of their complaint on behalf of STE.[6] Accordingly, defendant

---

**6.** Plaintiffs rely on the decision in *Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir. 1978) as support for the proposition that they have standing to bring this action under the Bank Holding Company Act. In *Swerdloff*, the Fifth Circuit found that the plaintiffs, Arthur

and Louis Swerdloff, could bring an action under the statute even though they as individuals were not customers of the defendant bank. That case is factually distinguishable from the case now before me because the Swerdloffs' company, which entered into a loan agreement

bank is entitled to summary judgment on this claim as a matter of law.

## THE BREACH OF CONTRACT CLAIM

Count II of the complaint alleges that the defendant bank breached its contract with plaintiffs when it failed to advance the $1 million to STE. Defendant argues that since "the undisputed facts of record clearly establish that Continental fully and completely complied with the terms of the written agreements [the J.P.A. and the Second Amendment] executed by the parties," it is entitled to summary judgment on this count. (p. 20, Defendant's memorandum in support of summary judgment). It is Continental's position that in order to prove their contract claim plaintiffs must rely on evidence outside the written documents. Continental further argues that such resort to extrinsic evidence is impermissible under Pennsylvania law because if the written contract is clear and unambiguous, the Parol Evidence Rule precludes consideration of matters outside the writing. In addition, defendant states "integration clauses" appearing in both the J.P.A. and the original loan agreement (incorporated in the Second Amendment) also prohibit consideration of evidence outside the "four corners" of the written documents.[7]

Plaintiffs respond by arguing that the Parol Evidence Rule is not applicable here because the parties to this suit were not the same parties who agreed to the Second Amendment. Plaintiffs contend that the Pennsylvania Parol Evidence Rule applies only to a contract between parties to the suit in question. Second, the Shulmans

maintain that on their face both the J.P.A. and the Second Amendment support their view of the contract rather than the view propounded by the defendant.

■ After considering the arguments made by the parties and the evidence now of record, I conclude that there are genuine issues as to material facts which preclude granting summary judgment on the contract claim. Earlier in this memorandum, I described in some detail the differing versions of the loan agreement advanced by the parties. I see no reason to go over that ground again, but I do note that the parties disagree about a number of matters regarding the contract. Contrary to defendant's assertion, however, these disagreements are not confined to matters outside the written documents. In fact, the parties cannot agree on the plain meaning of certain language found in both the J.P.A. and the Second Amendment.

■ The defendant's parole evidence argument is predicated on a finding that the writings in question, the J.P.A. and the Second Amendment, are clear and unambiguous. After carefully examining the J.P.A. and the Second Amendment, I am reluctant to characterize these writings as clear and unambiguous on their face.[8] For example, an important fact in dispute is whether Continental's obligation to loan the $1 million to STE was tied to an accounts receivable collateral formula. Both plaintiffs and defendant agree that Paragraph 2.1.6 of the Second Amendment controls this issue. In my view, the language of

with the bank, was a closely held family corporation in which the Swerdloffs were the sole stockholders. No such close legal identity exists between the Shulmans and STE. By plaintiffs' own account, from 1970 until its adjudication as a bankrupt, STE was a public corporation trading shares of its stock on the American Stock Exchange.

7. For example, the J.P.A. contains the following integration clause:

¶ 11(a) This agreement contains our sole and entire understanding and agreement with respect to its entire subject matter, and all prior negotiations, discussions, commitments, agreements and understandings here-

tofore had between us with respect thereto are hereby merged herein. This agreement cannot be changed or terminated orally.

8. In a recent opinion, the Third Circuit recommended a method for determining whether a writing is ambiguous for purposes of the Parol Evidence Rule:

. . . the judge [should] hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings. *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1011 (3d Cir. 1980).

Paragraph 2.1.6 is so unclear that it can be read to support either defendant's claim that the obligation was dependent on an accounts receivable formula or plaintiffs' claim that it was not. (*See* n.4 *supra*, for text of Paragraph 2.1.6) Consequently, the ambiguity of crucial language found in both the J.P.A. and the Second Amendment necessitates resort to extrinsic evidence to determine the intent of the parties.

■ Defendant also has argued that "integration clauses" appearing in the written documents bar any consideration of extrinsic evidence. Generally, the Pennsylvania courts strictly construe such clauses. *See, e. g., Glanski v. Ervine*, 269 Pa.Super. 182, 409 A.2d 425, 428–29 (1979). However, when a written contract is ambiguous, as are the writings in this case, an integration clause will not prevent consideration of extrinsic evidence to aid in interpreting the contract. *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1010, n.9 (3d Cir. 1980).

Having determined that some material facts are in dispute concerning the breach of contract claim, I will deny defendant's motion for summary judgment on this count.

## THE UNJUST ENRICHMENT CLAIM

Count III of the complaint alleges that because defendant Continental received the $1.3 million from the plaintiffs but did not make the $1 million loan to STE it has been enriched unjustly in the amount of $1.3 million. Continental has moved for summary judgment on this count, arguing that the principle of unjust enrichment does not apply to an agreement deliberately entered into by the parties and that at any rate STE, not the bank, received the benefit of the $1.3 million. For several reasons, these arguments are not persuasive.

■ First, as previously discussed in this memorandum, there are material facts in dispute regarding the nature of the loan agreement entered into by plaintiffs and defendants. Also, plaintiffs concede that they cannot recover both in damages (contract) and restitution (unjust enrichment or quasi contract) for the same transaction. While they do not challenge defendant's claim that the principle of unjust enrichment does not apply to agreements deliberately entered into, plaintiffs contend that if there has not been a meeting of minds, thus rendering the contract unenforceable, a party may recover for unjust enrichment. I share plaintiffs' view that if an agreement is unenforceable, in some circumstances a party may be entitled to restitution from another who has been unjustly enriched at that party's expense. *See, e. g., Sachs v. Continental Oil Company*, 454 F.Supp. 614, 619 (E.D.Pa.1978).

■ Finally, I do not share defendant's view that it is clear, on the present record, that Continental did not receive any benefit from the $1.3 million. With the $1.3 million, the Shulmans brought a junior participation in the bank's loan to STE, thereby allowing the bank to recoup a portion of the outstanding loan. In addition, as a result of the loan agreement with the Shulmans, Continental acquired additional collateral in the form of two valuable pieces of real estate. According to plaintiffs, the STE trustee in bankruptcy sold that collateral for the benefit of the bank for over $1 million. (p. 54, n.75, plaintiffs' memorandum in opposition to summary judgment) Accordingly, as the record now stands I cannot say as a matter of law that plaintiffs cannot recover against Continental for unjust enrichment.

## THE FRAUDULENT MISREPRESENTATION CLAIM

■ Count IV of the complaint alleges that Continental Bank, knowing that it would not advance additional funds, fraudulently induced Martin and Harry Shulman to buy a junior participation in the bank's loan to STE. Defendant's motion for summary judgment on this claim involves two arguments. First, it is urged that the complaint does not describe the alleged fraudulent conduct with sufficient specificity. Second, the defendant argues that plaintiffs cannot prove this claim without relying on evidence outside the written

documents, the J.P.A. and the Second Amendment. Citing *Bardwell v. The Willis Company*, 375 Pa. 503, 100 A.2d 102 (1953), the bank asserts that because there was a written agreement between the parties and plaintiffs have not alleged specifically that matters were omitted from the writings by fraud, accident or mistake, the Parole Evidence Rule bars any consideration of extrinsic evidence.

In addition to the fact that there are disputed material facts, discussed previously, concerning the terms of the loan agreement, I am not convinced by defendant's arguments that summary judgment would be appropriate on this count. While Count IV does not contain specific allegations regarding the purported fraudulent misrepresentation, it does incorporate by reference previous paragraphs of the complaint. Those paragraphs include allegations sufficiently specific to state a claim of fraudulent misrepresentation. Also without merit is the argument that the *Bardwell* line of cases would prevent the Shulmans from proving this claim. Recent Pennsylvania opinions have held that the principles of *Bardwell* do not control actions for misrepresentation and that the Parol Evidence Rule does not bar extrinsic evidence to show fraud or misrepresentation. *See, e. g., Miller v. Bare*, 457 F.Supp. 1359, 1365 (W.D. Pa.1978); *Sunseri v. RKO-Stanley Warner Theatres, Inc.*, 248 Pa.Super. 111, 374 A.2d 1342 (1977).

For these reasons, I also will deny summary judgment on the fraudulent misrepresentation claim.

THE PUNITIVE DAMAGES CLAIM

■ Finally, plaintiffs have included a claim for punitive damages, stating that the "fraudulent, unconscionable acts and conduct" of the defendant concerning the loan agreement mandate such an award. The only argument made by Continental is that since it is entitled to summary judgment on the other four claims it is also entitled to judgment on this claim. As I have denied summary judgment on Counts II through IV, this argument is unpersuasive. Also, in view of the record now before me in this case, I cannot say that as a matter of law plaintiffs cannot prove sufficiently outrageous conduct by defendant to permit an award of punitive damages.