J-A17021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ATTIKIS J. DAVIS AND KELLIE RAE DAVIS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL PANARELLA AND | : | |
| CHRISTINE A. PANARELLA | : | No. 2153 EDA 2021 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered October 8, 2021
In the Court of Common Pleas of Monroe County Civil Division at No(s):
003649-CV-2019

| | | |
|---|---|---|
| ATTIKIS J. DAVIS AND KELLIE RAE DAVIS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 2266 EDA 2021 |
| MICHAEL PANARELLA AND | : | |
| CHRISTINE A. PANARELLA | : | |

Appeal from the Judgment Entered October 8, 2021
In the Court of Common Pleas of Monroe County Civil Division at No(s):
003649-CV-2019

BEFORE:   PANELLA, P.J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED SEPTEMBER 19, 2022**

_____

[*] Retired Senior Judge assigned to the Superior Court.

In these cross-appeals,[1] Michael Panarella and Christine A. Panarella (the Panarellas) and Attikis J. Davis and Kellie Rae Davis (the Davises) appeal from the judgment entered in favor of the Davises and against the Panarellas. In the appeal at 2153 EDA 2021, the Panarellas challenge the trial court's calculation of damages and counsel fees, and in the cross-appeal at 2266 EDA 2021, the Davises contend that the trial court erred in failing to award punitive damages against the Panarellas. After review, we affirm.

The trial court summarized the procedural history and made the following findings of fact:

> This matter came before the [c]ourt for a non-jury trial held on April 30, 2021. [The Davises] alleged that [the Panarellas] sold them real property without disclosing an encroachment of a portion of the driveway and landscaping on a neighboring lot. [The Davises] also alleged the neighboring lot, owned by the [Panarellas] was to be sold to [the Davises] under a separate agreement. [The Davises] filed a complaint alleging adverse possession, violation of the Real Estate Seller Disclosure Law (RESDL), fraud, nuisance, trespass, replevin, specific performance and breach of contract. The parties have now submitted briefs, having waived the time period for a decision.
>
> **FINDINGS OF FACT**
>
> 1. [The Panarellas] were the owners of Lots 14 and 15 located at 229 Evergreen Court, Saylorsburg, Monroe County, Pennsylvania.
>
> 2. Lot 14 was a vacant lot and Lot 15 was improved with a house thereon, including a driveway and other outdoor improvements.
>
> 3. [The Panarellas] had listed the properties for sale at least three different times prior to June of 2017.

---

[1] This Court consolidated these cross-appeals *sua sponte*, and designated the Panarellas as Appellants/Cross-Appellees and the Davises as Appellees/Cross-Appellants. Order, 12/21/21; Order, 1/31/22.

4. [The Panarellas] had tried in the past to sell both of the properties together and at least one time listed and marketed them for sale together, consisting of a total of 3.64 acres.

5. Some time prior to June 2017, [the Panarellas] received a referral to James Galligan, a Keller Williams real estate agent located in Stroudsburg, PA, from Robert Pistone, a Keller Williams real estate agent located in Las Vegas, NV, where the [the Panarellas] had recently moved. Mr. Galligan and Mr. Pistone were both affiliated with Keller Williams and Mr. Pistone had received Mr. Galligan's information as an agent in the Poconos where these lots are located.

6. While in Las Vegas for a seminar in May 2017, Mr. Galligan met with Mr. Pistone and Mrs. Panarella to discuss a potential marketing plan for [the Panarellas'] property.

7. Mr. Pistone recalled that there was a discussion at that meeting of [the Panarellas] wanting to sell both lots together.

8. Sometime thereafter, Mr. Galligan met Mr. Panarella at the house on Lot 15 to discuss a listing agreement. Mr. Galligan advised that the market might not be conducive to the price the [the Panarellas] wanted for both properties, and that [the Panarellas] could list Lot 15 for sale and try to offer Lot 14 to a prospective buyer of Lot 15 when they made an offer, or wait and sell it separately in the future.

9. Based upon that conversation, Mr. Galligan prepared a listing agreement in early June 2017 for the improved Lot 15 only and the [the Panarellas] signed that agreement.

10. Mr. Galligan proceeded to list the property on the Multiple Listing Service (MLS), and marketed it specifically as Lot 15, consisting of an improved 1.94 acre lot.

11. [The Panarellas] filled out and signed a Sellers Property Disclosure Statement (Disclosure Statement) on or about June 5, 2017.

12. The Disclosure Statement at paragraph 18(B), specifically asking whether [the Panarellas] were aware of any encroachments, boundary line disputes, or any shared common areas/driveways, was answered "No" by [the Panarellas].

13. At the time they filled out the Disclosure Statement, [the Panarellas] knew that a portion of their driveway, landscaping,

retaining wall, and mailbox area encroached onto Lot 14 from Lot 15.

14. At the time they filled out the Disclosure Statement, and through August 2018, [the Panarellas] did not inform their real estate agent, Mr. Galligan, of the property encroachment from Lot 15 onto Lot 14.

15. If Mr. Galligan had been made aware of the encroachments he would have required that it be disclosed to potential buyers, and required that the lots be listed and sold together.

16. [The Davises] eventually became interested in the improved Lot 15 and were shown the property through their real estate agent, Jessica Keller.

17. Ms. Keller knew of no listing agreement that included Lot 14 being offered for sale with Lot 15, nor was it listed for sale together with Lot 15 in the MLS.

18. Ms. Keller subsequently learned of [the Panarellas'] ownership of Lot 14 through her own research and not because Lot 14 was listed in the MLS or presented as a package deal with Lot 15.

19. [The Davises] initially were only interested in purchasing the improved Lot 15 that was listed for sale in the MLS.

20. [The Davises] made an offer to purchase Lot 15 and [the Panarellas] issued a counteroffer at a higher price that also included Lot 14 in the sale.

21. [The Davises] were reluctant to purchase the vacant Lot 14 with Lot 15, but ultimately agreed to do so in order to meet the [the Panarellas'] demand in order to purchase Lot 15. The sale price for Lot 15 was $ 389,000 with closing on or before August 21, 2017. A separate installment agreement of sale was signed for vacant Lot 14 at a sale price of $25,000, with $500 down, $200 per month from September 21, 2017, and the balance due on or before August 21, 2018.

22. At no time prior to closing on Lot 15 on August 21, 2017 did [the Panarellas] advise either the [the Davises], [the Davises'] real estate agent, or [the Panarellas'] real estate agent, Mr. Galligan, that a portion of the driveway, landscaping, retaining wall and mailbox encroached from Lot 15 onto Lot 14.

23. [The Davises] would not have purchased the properties if they had known of the encroachments prior to closing.

24. Prior to the closing on Lot 15, [the Davises] had a home inspection performed.

25. As a result of the home inspection, a verbal agreement was reached, as memorialized in emails between the real estate agents. [The Panarellas] agreed to remediate the radon levels, have the septic system pumped, and have the well "shocked" due to coliform.

26. A written addendum to the contract for the repairs was prepared and signed by the [the Davises], but the [the Panarellas] never signed it.

27. On Friday, August 18, 2017, just days prior to the closing on Lot 15, [the Davises] found out from their real estate agent that the [the Panarellas] had called [the Davises'] mortgage company, inquiring whether or not the agreed upon repairs had to be performed in order to obtain a "clear to close" from the lender.

28. Upon learning that [the Davises] already had a "clear to close" from the lender, the [the Panarellas] informed their real estate agent that they would not be completing the agreed upon repairs, and the [the Davises] were forced to purchase the property "as is" or forego the entire transaction.

29. [The Davises] elected to proceed with the purchase and the parties closed on the sale of Lot 15 on Monday, August 21, 2017, at which time the [the Panarellas] paid the cost to pump the septic system, Mr. Galligan paid to shock the well, and [the Davises] were left with the radon mitigation cost.

30. After closing on Lot 15, [the Davises] paid $857 for additional plumbing work related to the well, $1100 for a radon mitigation system, and $75 to spray for carpenter bees for a total of $2032.

31. [The Davises] proceeded to move into the residence on Lot 15, made payments on Lot 14, and erected a shed on Lot 14 along the property line.

32. [The Davises] made ten (10) monthly payments of $200 through July 2018 for the vacant Lot 14, having missed the June payment.

33. [The Davises] also paid the 2018 property tax bill for Lot 14 at the request of the [the Panarellas].

34. On or about August 2, 2018, [the Davises] began leaving phone call messages and sending texts to [the Panarellas] requesting a six (6) month extension to close on Lot 14, and offering to double the monthly payment to $400 until closing.

35. [The Davises] paid $400 to [the Panarellas] on August 16, 2018, and left another message with [the Panarellas] repeating the request for an extension. At the time, they did not realize that one prior $200 payment had been missed, but this payment brought them current on the monthly payments under the installment agreement.

36. [The Panarellas] accepted all of the payments made by the [the Davises] totaling $2,400, together with the initial deposit of $500, for a total of $2,900, without declaring [the Davises] in default.

37. [The Panarellas] did not respond to the [the Davises'] requests to extend the closing date for Lot 14, and when the [the Davises] failed to close on or before August 21, 2018, as required in the installment agreement, [the Panarellas] notified [the Davises] they were in default and the agreement was terminated.

38. In [the Panarellas'] notification of default and termination, they indicated the property would be placed back on the market and that if [the Davises] still wanted to purchase Lot 14, the purchase price would now be $45,000. In a later phone call with [the Davises], the [the Panarellas] explained the increase in purchase price was due to the likely cost the [the Davises] would incur to remove the encroachments on Lot 14 if they did not purchase said lot.

39. Shortly thereafter, [the Panarellas] advised [the Davises] they would be erecting a fence along the property line of Lot 14 and Lot 15, and then did so about 20 days later. The fence effectively "fenced in" the [the Davises'] shed onto Lot 14. Although [the Davises] were able to remove contents of the shed before the fence was installed, they were unable to move the shed and a ramp to access the shed prior to the fence being installed.

40. On or about August 30, 2018, following a phone call with [the Panarellas], Mr. Galligan learned for the first time that a portion of the driveway, landscaping, retaining wall, and mailbox

encroached onto Lot 14 from Lot 15.  Mr. Galligan immediately advised his broker and [the Davises'] real estate agent.

41. Due to this new information, the [the Davises] engaged Frank Smith, Jr. to survey the lot line along Lots 14 and 15.

42. The survey revealed property boundary encroachments onto Lot 14 of the paved driveway, several paver areas, a ramp [the Davises] constructed to their shed on Lot 14, a small retaining wall, additional landscaping and the mailbox.

43. [The Davises] spent $972 erecting the ramp to their shed that the survey reveals is over the boundary line.

44. The driveway, pavers, retaining wall, landscaping and mailbox were all installed by or at the direction of the [the Panarellas].

45. [The Panarellas] obtained a cost estimate from Sugar Hollow to remove the areas of encroachment in the amount of $18,500.

46. [The Davises] were in the process of obtaining a permit to move the shed when [the Panarellas] erected the fence with no trespassing signs.

47. [The Davises] have had no access to their shed for nearly two (2) years and have been unable to move it due to the erection of the fence and no trespassing signs.

48. [The Panarellas] have demanded that [the Davises] remove the mailbox that [the Panarellas] had installed over the lot line onto Lot 14.

49. [The Panarellas] installed or directed installation of the driveway and other encroachments onto Lot 14 themselves, while owning both Lots 14 and 15.  This was done at the time of or after building the house on Lot 15, which was completed in 2002.

50. [The Davises] have incurred attorney's fees in this matter of $12,153 up to time of trial.

Trial Ct. Mem. and Order, 8/27/21, at 1-9 (some formatting altered).

At the conclusion of trial, the trial court concluded and awarded damages as follows:

1. The claim for Quiet Title/Adverse Possession is DENIED.

- 7 -

2. The claim under the Real Estate Sellers Disclosure Law (RESDL) is GRANTED and [the Davises] are awarded $2,900 in payments made for Lot 14, $972 for the ramp constructed to the shed and $18,500 as the cost to remove and repair the encroaching areas, all incurred as a result of the reliance on the Sellers' Disclosure Statement.

3. The claim for fraud is GRANTED. [The Davises] are awarded the same damages as set forth under the claim for violation of the RESDL, without needing to be assessed separately at this time since they were already awarded in paragraph 2 herein.

4. The claim for Nuisance is DENIED.

5. The claim for Trespass is DENIED.

6. The claim for Replevin is GRANTED. Plaintiffs shall have ninety (90) days from the date this matter is deemed final to enter [the Panarellas'] Lot 14 and retrieve their shed and ramp in the easiest manner available. [The Panarellas] shall cooperate in that regard.

7. The claim for Specific Performance is DENIED.

8. The claims for breach of contract are DENIED.

9. The claim for punitive damages is DENIED.

10. The claim for attorney's fees is GRANTED. [The Davises are] awarded $12,434.69 in attorney's fees.

The total amount of monetary damages awarded to [the Davises] and against [the Panarellas] is $34,806.69.

*Id.* at 26-27.

On September 1, 2021, the parties submitted a joint motion asking for an extension of time in which to file post-trial motions. The trial court granted the motion and directed that post-trial motions shall be filed on or before September 14, 2021. Order, 9/1/21.

The Panarellas filed their post-trial motion on September 7, 2021, and the Davises filed their post-trial motions on September 14, 2021. The trial

court denied both parties' post-trial motions and judgment was entered on October 8, 2021.[2]  The Panarellas filed their appeal on October 13, 2021, and the Davises cross-appealed on October 25, 2021.  The Davises, Panarellas, and the trial court complied with Pa.R.A.P. 1925.

## The Panarellas' Appeal

On appeal, the Panarellas present the following issues:

1. Whether the trial court erred when it found in favor of [the Davises] where there was no legally competent evidence which met the standard required to prove damages under the Real Estate Seller Disclosure Act[.]

2. Whether the trial court erred in speculating on the award of attorney fees.

3. Whether the trial court erred in awarding a return of down payment monies when the buyer defaults because they could not come up with the balloon payment.

4. Whether the trial court erred in finding that there was fraud, when the testimony clearly showed it was negligence, and not intentional.

The Panarellas' First Step Brief at 4 (formatting altered).

Our standard of review is as follows:

_____

[2] Although the Davises correctly appeal from the October 8, 2021 judgment, the record reflects that the Panarellas purport to appeal from the September 15, 2021 order denying post-trial motions.  A trial court's decision in a non-jury trial does not become final for purposes of appeal until properly reduced to and entered as a formal judgment under Pa.R.Civ.P. 227.4.  **See Morgan v. Millstone Resources Ltd.**, 267 A.3d 1235, 1243 (Pa. Super. 2021); **see also Mackall v. Fleegle**, 801 A.2d 577, 580 (Pa. Super. 2002) (explaining that an appeal does not properly lie from an order denying a post-trial motion, but rather from the judgment entered following disposition of post-trial motions).  We have corrected the caption accordingly.

Upon appeal of a non-jury trial verdict, we consider the evidence in a light most favorable to the verdict winner and will reverse the trial court only if its findings of fact lack the support of competent evidence or its findings are premised on an error of law.

When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected. The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence.

It is inappropriate for an appellate court to make factual determinations in the face of conflicting evidence.

*Phelps v. Caperoon*, 190 A.3d 1230, 1243 (Pa. Super. 2018) (citation omitted and formatting altered).

At the outset, we note that although the Panarellas purport to raise four issues in their statement of questions presented, their brief contains only one lengthy argument section in violation of Pa.R.A.P. 2119(a) (stating "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part[,] in distinctive type . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Additionally, the Panarellas' brief consists of unsupported assertions of error and undeveloped claims combined into a single argument. *See* the Panarellas' First Step Brief at 8-15. Upon review, we conclude that this conglomeration of arguments and undeveloped allegations of error result in waiver. *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) (providing that arguments that fail to adhere to the

Pennsylvania Rules of Appellate Procedure and arguments that are not developed are waived); *see also Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018) (noting that it is not the duty of the reviewing court to develop an argument for an appellant or scour the record to find evidence to support an argument).  In any event, were we to reach the Panarellas' issues, we would affirm on the basis of the trial court's opinion.  *See* Trial Ct. Mem. and Order, 8/27/21, at 1-27.

### The Davises' Cross-Appeal.

In their cross-appeal at 2266 EDA 2021, the Davises raise the following issues:

1. Did the trial court commit reversible error when it declined to award treble and/or punitive damages?

2. Did the trial court commit reversible error when it denied [the Davises'] count for nuisance?

3. Did the trial court commit reversible error when it denied [the Davises'] count for trespass?

4. Did the trial court commit reversible error when it denied [the Davises'] count for specific performance?

5. Did the trial court commit reversible error when it denied [the Davises'] count for breach of contract?

6. Did the trial court commit reversible error when it denied [the Davises'] count for quiet title/adverse possession?

The Davises' Second Step Brief at 1-2 (formatting altered).

Upon review, however, we conclude that the argument portion of the Davises' brief suffers from deficiencies similar to those found in the Panarellas' brief.  Although the Davises identify issues and present multiple statements

of the law, they fail to develop any legal argument or provide relevant support for their conclusory statements. *See* the Davises' Second Step Brief at 23-35. Rather, the Davises' arguments are undeveloped, and as such, we conclude that they have waived their issues on appeal. *See Lackner*, 892 A.2d at 29; *see also Milby*, 189 A.3d at 1079. In any event, were we to reach the merits of the Davises' claims of error, we would affirm on the basis of the trial court's opinion. *See* Trial Ct. Mem. and Order, 8/27/21, at 1-27.

## **Conclusion**

After review, and for the reasons set forth above, we conclude that neither the Panarellas nor the Davises are entitled to appellate relief. Accordingly, we affirm the judgment following the trial court's opinion and order of August 27, 2021, which included its non-jury trial judgment determination in this matter.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/19/2022

Filed 11/30/2021 10:33:46 AM Superior Court Eastern District
2153 EDA 2021

## COURT OF COMMON PLEAS OF MONROE COUNTY
## FORTY-THIRD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

ATTIKIS J. DAVIS and
KELLIE RAE DAVIS,

              Plaintiffs

    vs.

MICHAEL PANARELLA and
CHRISTINE A. PANARELLA,

              Defendants

: NO. 3649 CIVIL 2019
:
:
:
:
:
:
:
:
:
:
:
: NON-JURY TRIAL

## O P I N I O N

This matter came before the Court for a non-jury trial held on April 30, 2021.

Plaintiffs, Attikis J. Davis and Kellie Rae Davis ("Plaintiffs") alleged that Defendants, Michael

Panarella and Christine A. Panarella, sold them real property without disclosing an encroachment

of a portion of the driveway and landscaping on a neighboring lot. Plaintiffs also alleged the

neighboring lot, owned by the Defendants, was to be sold to them under a separate agreement.

Plaintiffs filed a Complaint alleging adverse possession, violation of the Real Estate Seller

Disclosure Law ("RESDL"), fraud, nuisance, trespass, replevin, specific performance and breach

of contract. The parties have now submitted briefs, having waived the time period for a decision.

# FINDINGS OF FACT

1. Defendants were the owners of Lots 14 and 15 located at 229 Evergreen Court, Saylorsburg, Monroe County, Pennsylvania. N.T. 4/30/21 pp. 15-17, p. 87; Plaintiffs' Exh. 1 and 9.

2. Lot 14 was a vacant lot and Lot 15 was improved with a house thereon, including a driveway and other outdoor improvements. N.T. 4/30/21 p. 105; Plaintiffs' Exh. 1 and 9.

3. Defendants had listed the properties for sale at least three different times prior to June of 2017. Id. at 58-59; 130.

4. Defendants had tried in the past to sell both of the properties together and at least one time listed and marketed them for sale together, consisting of a total of 3.64 acres. Id. at 88; 109; Plaintiffs' Exh. 19.

5. Some time prior to June 2017, Defendants received a referral to James Galligan, a Keller Williams real estate agent located in Stroudsburg, PA, from Robert Pistone, a Keller Williams real estate agent located in Las Vegas, NV, where the Defendants had recently moved. Mr. Galligan and Mr. Pistone were both affiliated with Keller Williams and Mr. Pistone had received Mr. Galligan's information as an agent in the Poconos where these lots are located. N.T. 4/30/21 pp. 58; 61-62; 70-71; 88; 112-113.

6. While in Las Vegas for a seminar in May 2017, Mr. Galligan met with Mr. Pistone and Mrs. Panarella to discuss a potential marketing plan for Defendants' property. Id. at 61-62; 76-77; 113-114.

7. Mr. Pistone recalled that there was a discussion at that meeting of Defendants wanting to sell both lots together. Id. at 112-120.

8. Sometime thereafter, Mr. Galligan met Mr. Panarella at the house on Lot 15 to discuss a listing agreement. Id. at 62-64; 77-78. Mr. Galligan advised that the market might not be conducive to the price the Defendants wanted for both properties, and that Defendants could list Lot 15 for sale and try to offer Lot 14 to a prospective buyer of Lot 15 when they made an offer, or wait and sell it separately in the future. Id. at 60-61.

9. Based upon that conversation, Mr. Galligan prepared a listing agreement in early June 2017 for the improved Lot 15 only and the Defendants signed that agreement. Id. at 60-63; 68-69; 89; 101.

10. Mr. Galligan proceeded to list the property on the Multiple Listing Service ("MLS"), and marketed it specifically as Lot 15, consisting of an improved 1.94 acre lot. Id.

11. Defendants filled out and signed a Sellers Property Disclosure Statement ("Disclosure Statement") on or about June 5, 2017. Plaintiffs' Exh. 2; N.T. 4/30/21 pp. 89-90; 101-102; 122-123.

12. The Disclosure Statement at paragraph 18(B), specifically asking whether Defendants were aware of any encroachments, boundary line disputes, or any shared common areas/driveways, was answered "No" by the Defendants. Plaintiffs' Exh. 2; N.T. 4/30/21 pp. 19-20; 109; 122.

13. At the time they filled out the Disclosure Statement, Defendants knew that a portion of their driveway, landscaping, retaining wall, and mailbox area encroached onto Lot 14 from Lot 15. N.T. 4/30/21 pp. 89-90; 100; 102-103; 105; 123-125.

3

14. At the time they filled out the Disclosure Statement, and through August 2018, Defendants did not inform their real estate agent, Mr. Galligan, of the property encroachment from Lot 15 onto Lot 14. Id. at pp. 19; 65; 68-69; Plaintiff's Exh. 14.

15. If Mr. Galligan had been made aware of the encroachments he would have required that it be disclosed to potential buyers, and required that the lots be listed and sold together. Id. at pp. 65-66.

16. Plaintiffs eventually became interested in the improved Lot 15 and were shown the property through their real estate agent, Jessica Keller. Id. at 16-17.

17. Ms. Keller knew of no listing agreement that included Lot 14 being offered for sale with Lot 15, nor was it listed for sale together with Lot 15 in the MLS. Plaintiffs' Exh. 24 pp. 12, 13, 23, 26-28; Plaintiffs' Exh. 2.

18. Ms. Keller subsequently learned of Defendants' ownership of Lot 14 through her own research and not because Lot 14 was listed in the MLS or presented as a package deal with Lot 15. Id.

19. Plaintiffs initially were only interested in purchasing the improved Lot 15 that was listed for sale in the MLS. N.T. 4/30/21 pp. 17; 20-21; 50-51.

20. Plaintiffs made an offer to purchase Lot 15 and Defendants issued a counter-offer at a higher price that also included Lot 14 in the sale. Id. at 20; 34; 50-51; Defendants' Exh. "B."

21. Plaintiffs were reluctant to purchase the vacant Lot 14 with Lot 15, but ultimately agreed to do so in order to meet the Defendants' demand in order to purchase Lot 15. The sale price for Lot 15 was $389,000 with closing on or before August 21, 2017. A separate

4

installment agreement of sale was signed for vacant Lot 14 at a sale price of $25,000, with $500 down, $200 per month from September 21, 2017 and the balance due on or before August 21, 2018. Plaintiffs' Exh. 1, 7 and 8; N.T. 4/30/21 pp. 50-51; 54-55.

22. At no time prior to closing on Lot 15 on August 21, 2017 did Defendants advise either the Plaintiffs, Plaintiffs' real estate agent, or Defendants' real estate agent, Mr. Galligan, that a portion of the driveway, landscaping, retaining wall and mailbox encroached from Lot 15 onto Lot 14. N.T. 4/30/21 pp. 19-20; 29-30; 35-36; 52-53; 65-66; 68-69; Plaintiffs' Exh. 24 pp. 13; 23-24; 26-28.

23. Plaintiffs would not have purchased the properties if they had known of the encroachments prior to closing. N.T. 4/30/21 pp. 20-21; 30.

24. Prior to the closing on Lot 15, Plaintiffs had a home inspection performed. Plaintiffs' Exh. 3; N.T. 4/30/21 pp. 25; 42; 66-67.

25. As a result of the home inspection, a verbal agreement was reached, as memorialized in emails between the real estate agents. Defendants agreed to remediate the radon levels, have the septic system pumped, and have the well "shocked" due to coliform. N.T. 4/30/21 pp. 66-68; 71-72; Plaintiffs' Exh. 5.

26. A written addendum to the contract for the repairs was prepared and signed by the Plaintiffs, but the Defendants never signed it. N.T. 4/30/21 pp. 44; 66-68; 81-82; 91-92; Plaintiffs' Exh. 4.

27. On Friday, August 18, 2017, just days prior to the closing on Lot 15, Plaintiffs found out from their real estate agent that the Defendants had called Plaintiffs'

mortgage company, inquiring whether or not the agreed upon repairs had to be performed in order to obtain a "clear to close" from the lender. N.T. 4/30/21 pp. 42-44; 91-93.

28. Upon learning that Plaintiffs already had a "clear to close" from the lender, the Defendants informed their real estate agent that they would not be completing the agreed upon repairs, and the Plaintiffs were forced to purchase the property "as is" or forego the entire transaction. Id. at 42-44; 67-68; 71-72; 91-93.

29. Plaintiffs elected to proceed with the purchase and the parties closed on the sale of Lot 15 on Monday, August 21, 2017, at which time the Defendants paid the cost to pump the septic system, Mr. Galligan paid to shock the well, and Plaintiffs were left with the radon mitigation cost. Id. at 67-68; 73-74; Plaintiffs' Exh. 6.

30. After closing on Lot 15, Plaintiffs paid $857 for additional plumbing work related to the well, $1100 for a radon mitigation system, and $75 to spray for carpenter bees for a total of $2032. N.T. 4/30/21 p. 42; Plaintiffs' Exh. 6.

31. Plaintiffs proceeded to move into the residence on Lot 15, made payments on Lot 14, and erected a shed on Lot 14 along the property line. N.T. 4/30/21 pp. 22-23; 32; 48; 52-53.

32. Plaintiffs made ten (10) monthly payments of $200 through July 2018 for the vacant Lot 14, having missed the June payment. N.T. 4/30/21 pp. 32; 126-127; Plaintiffs' Exh. 9.

33. Plaintiffs also paid the 2018 property tax bill for Lot 14 at the request of the Defendants. N.T. 4/30/21 p. 48.

34. On or about August 2, 2018, Plaintiffs began leaving phone call messages and sending texts to Defendants requesting a six (6) month extension to close on Lot 14, and

6

offering to double the monthly payment to $400 until closing. Id. at 41-42; 93-94; Plaintiffs' Exh. 9, 10 and 11; Defendants' Exh. "A."

35. Plaintiffs paid $400 to Defendants on August 16, 2018 and left another message with Defendants repeating the request for an extension. At the time, they did not realize that one prior $200 payment had been missed, but this payment brought them current on the monthly payments under the installment agreement. N.T. 4/30/21 pp. 31-32; 130; Plaintiffs' Exh. 9, 10, 11 and 12; Defendants' Exh. "A."

36. Defendants accepted all of the payments made by the Plaintiffs totaling $2,400, together with the initial deposit of $500, for a total of $2,900, without declaring Plaintiffs in default. N.T. 4/30/21 pp. 32, 93-94; 126-127; Defendants' Exh. "A."

37. Defendants did not respond to the Plaintiffs' requests to extend the closing date for Lot 14, and when the Plaintiffs failed to close on or before August 21, 2018 as required in the installment agreement, Defendants notified Plaintiffs they were in default and the agreement was terminated. N.T. 4/30/21 pp. 41-42; 46; 94-96; 106-108; 127-128; Plaintiffs' Exh. 13.

38. In the Defendants' notification of default and termination, they indicated the property would be placed back on the market and that if Plaintiffs still wanted to purchase Lot 14, the purchase price would now be $45,000. Id. In a later phone call with Plaintiffs, the Defendants explained the increase in purchase price was due to the likely cost the Plaintiffs would incur to remove the encroachments on Lot 14 if they did not purchase said lot. Defendants' Exh. "A" p. 6.

39. Shortly thereafter, the Defendants advised the Plaintiffs they would be erecting a fence along the property line of Lot 14 and Lot 15, and then did so about 20 days later. The fence effectively "fenced in" the Plaintiffs' shed onto Lot 14. Although Plaintiffs were able to remove contents of the shed before the fence was installed, they were unable to move the shed and a ramp to access the shed prior to the fence being installed. N.T. 4/30/21 pp. 22-24; 26-28; 36-41; 104-105; 128-129.

40. On or about August 30, 2018, following a phone call with Defendants, Mr. Galligan learned for the first time that a portion of the driveway, landscaping, retaining wall, and mailbox encroached onto Lot 14 from Lot 15. Mr. Galligan immediately advised his broker and Plaintiffs' real estate agent. Id. at 61; 68-69; Plaintiffs' Exh. 14.

41. Due to this new information, the Plaintiffs engaged Frank Smith, Jr. to survey the lot line along Lots 14 and 15. N.T. 4/30/21 p. 21; Plaintiffs' Exh. 15.

42. The survey revealed property boundary encroachments onto Lot 14 of the paved driveway, several paver areas, a ramp Plaintiffs constructed to their shed on Lot 14, a small retaining wall, additional landscaping and the mailbox. Plaintiffs' Exh. 15.

43. Plaintiffs spent $972 erecting the ramp to their shed that the survey reveals is over the boundary line. N.T. 4/30/21 p. 23; Plaintiffs' Exh. 16.

44. The driveway, pavers, retaining wall, landscaping and mailbox were all installed by or at the direction of the Defendants. N.T. 4/30/21 pp. 26-27; 89-90; 102-103; 105; 123-125.

45. Defendants obtained a cost estimate from Sugar Hollow to remove the areas of encroachment in the amount of $18,500. Defendants' Exh. "A" p. 6.

8

46. Plaintiffs were in the process of obtaining a permit to move the shed when Defendants erected the fence with no trespassing signs. N.T. 4/30/21 pp. 22-24; 26-28; 36-41; 94-97; 104-105; 128-129.

47. Plaintiffs have had no access to their shed for nearly two (2) years and have been unable to move it due to the erection of the fence and no trespassing signs. Id.

48. Defendants have demanded that Plaintiffs remove the mailbox that Defendants had installed over the lot line onto Lot 14. Id. at 26-27; 96.

49. Defendants installed or directed installation of the driveway and other encroachments onto Lot 14 themselves, while owning both Lots 14 and 15. This was done at the time of or after building the house on Lot 15, which was completed in 2002. Id. 87; 105.

50. Plaintiffs have incurred attorney's fees in this matter of $12,153 up to time of trial. Plaintiffs' Exh. 25 and 26. ($13,615.94 less $1,462.50 (6 hrs. @243.75) estimated for trial).

## DISCUSSION

Plaintiffs have filed suit with claims of quiet title by adverse possession; Real Estate Sellers Disclosure Law ("RESDL") violations; fraud; nuisance; trespass; replevin; specific performance and breach of contract. We will discuss those claims in that order.

A. Quiet Title by Adverse Possession –

For adverse possession to apply, one must occupy the land of another who has title to said land and the occupier's possession must be actual, exclusive, visible, notorious, distinct and hostile for a period of 21 years or more. 42 Pa. C.S.A. Section 5530; Burns v. Mitchell, 381 A.2d 487 (Pa. Super. 1977). The term "hostile" means the person in possession

9

intends to hold title against the record title holder. <u>Glenn v. Shuey</u>, 407 Pa. Super. 213, 595 A.2d 606 (1991).

In this case, Defendants purchased Lots 14 and 15 together by deed dated March 26, 2001. *See* Plaintiffs Exh. 17. Defendants then constructed a house on Lot 15, together with a driveway, retaining wall, other landscaping and a mailbox sometime in 2001-2002. The encroachments started to exist, at the earliest, in 2001. Plaintiffs discovered the encroachments in 2018 and Defendants constructed a fence along the property line at that time, ending any period of possession that had been created. This was less than 21 years.

More importantly, the possession for the entire time the Defendants owned both lots did not qualify as adverse possession because such possession was not hostile. One who holds title to both parcels containing the encroachment cannot intend to hold the property against the record title holder because they are the same person. By the very definition of "hostile," one who owns both parcels with an encroachment from one onto the other, does not have a claim for adverse possession. Therefore, any such adverse possession of the area of the encroachments did not start to be hostile until Plaintiffs purchased Lot 15 in 2017. Insufficient time has passed since then to claim adverse possession of the disputed area. Therefore, the Plaintiffs have not met the requirements for adverse possession.

B. <u>Real Estate Seller Disclosure Law ("RESDL")</u> –

All residential real estate sales require that sellers fill out, sign, and provide to buyers prior to a sale, a detailed disclosure regarding the real property. 68 Pa. C.S.A. Section 7301-7314. (the "RESDL") Under the RESDL, sellers must disclose any material defects with

10

the property. *See* 68 Pa. C.S.A. Section 7303. A material defect is one that could have a significant adverse impact on the value of real property being sold. 68 Pa. C.S.A. Section 7102; *See* also Phelps v. Caperoon, 2018 Pa. Super. 171, 190 A.3d 1230 (2018). The required Seller's Disclosure Statement includes the condition of soils, drainage and boundaries. *See* 68 Pa. C.S.A. Section 7304 (B)(13). Sellers are not liable for failure to disclose where they have no knowledge of a material defect, or believe it was corrected. Id. at Section 7309. A real estate agent can also be liable if they had actual knowledge of a material defect and did not disclose it to buyers. Id. at Section 7310.

A Disclosure Statement is required to be filled out and signed by sellers even if a property is being sold "as is." Phelps supra. An innocent misrepresentation about boundary lines can also be material and actionable on the theory that sellers know basic facts about their property before a sale. *See* Miller v. Bare, 457 F. Supp. 1359 (W.D. Pa. 1978). Finally, there are no exceptions to the disclosure requirement. Phelps supra.

Here, the Defendants answered "No" to question 18B in the Disclosure Statement which asked whether they were aware of any encroachments, boundary line disputes or of any shared common areas, such as driveways. In this case, a portion of the driveway, retaining wall, landscaping materials and mailbox all encroached onto Lot 14 from Lot 15. Defendants knew of the encroachments over the boundary line prior to the sale to Plaintiffs. Defendants had the home and all improvements thereon constructed, including the areas encroaching on Lot 14. But, they failed to disclose it to the Plaintiffs, either in writing as required by the RESDL, or orally. We do not find Defendants credible in their testimony that they disclosed the encroachments to their real estate agent, James Galligan. We find Mr. Galligan's testimony

11

more convincing and credible in that regard. However, even if they had, Defendants still would not be relieved of their duty to disclose in the Disclosure Statement. 68 Pa. C.S.A. Section 7301 et seq. On the face of the Sellter's Disclosure Statement alone, we find that the Defendants failed to disclose a known defect.

We also find the encroachments were a material defect of Lot 15. The encroachments had a substantial effect on the value of the property as part of the driveway, retaining wall, landscaping and mailbox were on a separate lot. All would have to be removed from Lot 14 upon demand of the owner of Lot 14, unless an easement was granted, or a subdivision of part of Lot 14 was approved. Those scenarios would be subject to the approval of the owner of Lot 14, and in the case of a subdivision, the approval of the Township would also be required. Defendants own Lot 14, want to sell Lot 14, and have shown that they are unlikely to work with the Plaintiffs to correct the situation. Even if Defendants would do so, there would be legal and professional expenses incurred. Furthermore, Plaintiffs testified that had they known of the encroachments prior to signing an agreement of sale or closing on the real property, they never would have purchased the property, even if Lot 14 was being purchased together at the same time as Lot 15.

Defendants argue they notified their real estate agent of the encroachment, and cite this as the reason for wanting to sell Lot 14 with Lot 15. We find their testimony unconvincing. Mr. Galligan, a licensed real estate agent in Pennsylvania for 22 years, understands the ramifications of non-disclosure, and he was more credible in his testimony that he would have disclosed the encroachments immediately had he known of them. This is backed up by Mr. Galligan's decision to immediately inform his broker and Plaintiffs' real estate agent

12

when he was advised of the encroachment by the Defendants over a year after the closing on Lot 15, when the Lot 14 sale did not take place. Adding to Mr. Galligan's credibility over that of the Defendants is that the Defendants then used the encroachment issue to try and leverage the Plaintiffs into purchasing Lot 14 at a higher price, once the original installment agreement had expired. Defendants admitted as much in a telephone call to the Plaintiffs in September 2018 when they told Plaintiffs the higher sale price was because the parties now faced potential legal fees and/or a cost of at least $15,000-$18,000 to remove the encroachments. *See* Defendants' Exh. "A" p. 6. In doing so, the Defendants actually admitted that the higher purchase price for Lot 14 was due to the encroachments and the potential cost Plaintiffs would have to correct them now that they knew about it. Id. This is unconscionable since Defendants knew of the encroachments, failed to disclose the encroachments, and now had the Defendants over a barrel, because they had not been able to close on Lot 14 under the original installment agreement. Furthermore, even if the Defendants had told Mr. Galligan prior to Plaintiffs entering an agreement of sale with them that there was an encroachment, Defendants still violated the RESDL by failing to note the encroachment in the Disclosure Statement. That requirement cannot be waived. *See* Phelps, supra.

Defendants also seem to be arguing that the mistake, if any, was innocent, since they were selling both lots to the Plaintiffs, albeit not at the same time. First, there is no such exception under the RESDL. Second, Lot 14 was not being conveyed simultaneously with Lot 15, and there was always a chance (as it proved to be) that Plaintiffs would not close on the purchase of Lot 14. In any event, it still would have been a material defect even if Plaintiffs had closed on the purchase of Lot 14, as they would have potential expenses when they sold either

13

Lot 14, or 15, or even both together, once the encroachments were discovered. Even if the encroachments could have been discovered by the Plaintiffs if they had done a survey prior to closing (which is rarely done in Pennsylvania), that is no excuse for non-disclosure under the RESDL. Finally, the persuasive arguments set forth in Miller v. Bare, supra, convince us that the encroachments were a basic fact about the properties that Defendants knew of and failed to disclose. According to the Defendants' own testimony, it was one reason they wanted to sell the lots together. Any "innocent mistake" claimed by them is disingenuous, and still actionable. They knew about the encroachments and should have disclosed them, whether they were selling the lots together or not. The whole purpose of the RESDL is disclosure so informed decisions can be made.

As we find the Defendants violated the RESDL, the next issue is damages sustained. The RESDL provides for "actual damages" of the other party. 68 Pa. C.S.A. Section 7311; Phelps v. Caperoon, supra. Although Plaintiffs stated in testimony they would not have purchased either lot if they knew of the encroachments, they are not seeking rescission of the sale of Lot 15 and they ultimately did not purchase Lot 14. Plaintiffs have not presented any evidence of diminution of value of Lot 15 due to the encroachments. As a result, there is only speculation as to the value of Lot 15 being less than the purchase price due to the encroachments. Plaintiffs have provided convincing testimony that Defendants have demanded that Plaintiffs remove the mailbox encroaching on Lot 14 that the Defendants actually installed. Defendants have not yet demanded removal of the other encroachments, but they or a new owner of Lot 14 could do so at any time. However, the Plaintiffs did not present any costs incurred or estimates of costs to remove and repair the areas of encroachment.

14

We find that the payments made to purchase Lot 14 and the proven costs associated with the shed incurred by the Plaintiffs are included within the meaning of "actual damages" under Section 7311 of the RESDL. 68 Pa. C.S.A. Section 7311. Although Plaintiffs have not provided a claim for rescission with respect to Lot 15, or a loss in value or cost to repair/remediate Lot 15 due to Defendants' violations of the RESDL, Plaintiffs have adequately plead and testified they would not have attempted to purchase Lot 14 with known encroachments. They ultimately did not close on the purchase for other reasons, but not before incurring payments to the Defendants to purchase Lot 14, and to place the shed on Lot 14. We find these are actual damages incurred due to reliance upon the Defendants' Disclosure Statement as contemplated by the Pennsylvania legislature in adopting the RESDL and as set forth in Phelps v. Caperoon, supra. These damages were sought and proven as being incurred by the Plaintiffs. The Defendants' failure to disclose the encroachments led directly to Plaintiffs incurring those expenses that were proven at time of trial. Those damages include the deposit paid on Lot 14 of $500, ten (10) payments of $200 and one (1) payment of $400 ($2,400), and $972 for construction of the ramp to the shed. None of those costs would have been incurred if Defendants had made the appropriate disclosure. Plaintiffs provided no testimony of the costs they claimed in their Complaint for storage fees as a result of not having access to the shed to move it. Therefore, those costs cannot be awarded. The total amount of proven damages directly incurred by Plaintiffs related to Lot 14 for Defendants' failure to disclose is $3,872.00.[1]

---

[1] Plaintiff testified credibly that they paid a real estate tax bill on Lot 14 at the direction of Defendants, but they failed to state the amount of that bill so we cannot consider it for damages.

15

Although the Plaintiffs did not present proof of the cost to remove the encroachments, testimony on behalf of the Defendants did. *See* Defendants' Exh. "A" p. 6. In a telephone call with the Plaintiffs, the Defendants estimated the cost to remove the encroachments as $15,000 - $18,000. They further stated that they received a quote for such work from "Sugar Hollow" in the amount of $18,500. Id. We don't doubt that the Defendants received such a quote, as they appeared to have been readily prepared for the telephone conversation with Plaintiffs that was recorded and transcribed as Defendants' Exh. "A," which took place after Plaintiffs' default on the purchase of Lot 14. Defendants spoke of talking to a lawyer, contemplating suing both real estate agents, (including Mr. Galligan for "illegal" actions and a "federal offense"), and obtaining a quote to remove the encroachments. The text of that conversation clearly shows that Defendants were prepared to deflect blame from them to the real estate professionals and to convince the Plaintiffs of the costs and problems they would incur by not purchasing Lot 14. These costs and problems were the rationale of the Defendants wanting an additional $20,000 to sell the lot to the Plaintiffs. Defendant Michael Panarella explained the higher price as follows: "So, that's why that letter came in at $45,000 because if you did not want to buy the property, that would guarantee you that would cost you $15,000 - $18,000 to move everything." Id. Mr. Panarella had previously said in that conversation:

> "Because of the fact that the encroachment is there, as it stands right now the mailbox would have to be moved, the shed would have to be moved, the driveway to a certain point would have to be moved, the retaining wall would have to be moved, all that garden has to be moved. Now if you don't buy your (sic) property, so what I did was have Sugar Hollow bill $18,500 to do that. So what I did was add that onto of (sic) the money that was supposed to be done in closing with the interest I turned around when payments were late." Id.

16

We find the Defendants' estimate of work to remove the encroachments both credible and convincing due to the context in which it was made. We take this as an admission of the Defendants of the cost to remove the encroachments. The Defendants were clearly trying to rationalize to the Plaintiffs why the failure to purchase Lot 14 timely, would result in a higher purchase price thereafter. It appears they did their homework on said cost to remove the encroachments, making it both convincing and reasonable as the cost to correct. Therefore, the cost of $18,500 is a proven damage incurred by the Plaintiffs. The total damages to be awarded due to Defendants' non-disclosure and violation of the RESDL is $22,372.

C. Fraud –

Plaintiffs' next claim is for common law fraud. They must show clear and convincing evidence of 1) a representation; 2) which is material to the transaction at hand; 3) made falsely with knowledge of the falsity or recklessness as to whether it is true or false; 4) with the intent of misleading another into relying on it; 5) justifiable reliance on the misrepresentation; and, 6) resulting injury from the reliance. Gibbs v. Ernst, 538 Pa. 193, 674 A.2d 882 (1994). In this case, the elements of common law fraud have also been met. We find Plaintiffs and Mr. Galligan credible and convincing that Defendants never disclosed the encroachments on Lot 14 to them until a year after the closing on Lot 15. The statements were made in the Seller's Disclosure Statement which listed no encroachments or boundary line problems. This representation was clearly false. It was material to the transaction at hand. Plaintiffs testified they would not have purchased either property if the correct representation had been made. Defendants' intent to mislead Plaintiffs to rely on the representation is clear in the

17

circumstantial evidence of this case. That includes the price paid for both lots; Defendants' insistence that Plaintiffs purchase Lot 14 after receiving an offer from them to only purchase Lot 15; Defendants' non-disclosure in the Seller's Disclosure Statement and failure to notify Mr. Galligan of the encroachments; and, Defendants notifying Mr. Galligan and the Plaintiffs only after Plaintiffs sought more time to close on Lot 14, Defendants' termination of the agreement on Lot 14, and subsequent request for a higher purchase price at that time.

The Plaintiffs clearly relied on the misrepresentation, as they purchased Lot 15, signed an installment agreement to buy Lot 14, and moved their shed onto Lot 14 and constructed a ramp to it. The damages sustained were those set forth above under the RESDL violation: $500 down payment and $2,400 in payments on Lot 14, the ramp cost of $972, and $18,500 to remove the encroachments. We find these were the provable damages for fraud, being the same as the violation of the RESDL.

D. Nuisance –

Plaintiffs' next claim is for nuisance. A person is subject to liability for a private claim of nuisance if the conduct invades another's interest in the enjoyment of land, and the invasion is a) intentional and unreasonable or b) unintentional, but reckless. Restatement (Second) of Torts Section 822. However, such liability will only extend to instances of significant harm of a kind suffered by a normal person or by a property in normal condition and used for normal purposes. Restatement (Second) of Torts Section 821F. Here, the nuisance alleged is the encroachment onto Lot 14, created by the Defendants, and the shed erected on Lot 14 by the Plaintiffs, that is now fenced in by the Defendants. The encroachments do not

18

constitute a nuisance to Lot 15 and Plaintiffs' enjoyment therein under the definition of the Restatement. Although Plaintiffs may need to move their mailbox, there is no other immediate action requested. Nor are any of the encroachments an invasion of someone else onto Plaintiffs' Lot 15.

With regard to the shed, again, there is no invasion of the Plaintiffs' use and enjoyment of land, being Lot 15. The shed is on the Defendants' Lot 14. The Defendants are not encroaching or preventing use of Plaintiffs' Lot 15. Therefore, nuisance does not apply in this case.

E. Trespass –

Plaintiffs claim a trespass on their land by the actions of the Defendants. A trespass is defined as an unprivileged, intentional intrusion upon land in possession of another. Kopka v. Bell Telephone Co., 371 Pa. 444, 91 A.2d 232 (1952). For the same reasoning as set forth above concerning nuisance, there is no actionable claim for trespass. Here, Defendants are not trespassing on Plaintiffs' Lot 15. The encroachments are onto Lot 14. The Plaintiffs' shed is located on Lot 14, but Defendants are not encroaching in any way on Plaintiffs' Lot 15. Therefore, the claim for trespass will be denied.

F. Replevin –

Plaintiffs' shed is located on Defendants' Lot 14. It was placed there when Plaintiffs were under agreement to purchase Lot 14. Plaintiffs constructed a ramp to access the shed at a cost of $972. They then moved items that were in the shed to a storage facility when the Defendants terminated the Agreement of Sale for Lot 14 due to Plaintiffs' inability to close

19

within the timeframe set in the Agreement. Defendants gave notice of termination of the Agreement, notice they would be constructing a fence along the property line, and then constructed that fence. Plaintiffs were unable to move the shed prior to the fence being erected and now there are "no trespassing" signs posted on Lot 14.

Replevin is an action to regain possession of goods detained or illegally possessed by another. Int'l. Elec. Co. v. N.S.T. Metal Prod. Co., 370 Pa. 213 (1952). The shed clearly belongs to Plaintiffs. It was placed on Lot 14 when the Plaintiffs had an equitable interest therein under the installment agreement of sale with Defendants. We also find that the shed was placed on Lot 14 with Defendants' knowledge and without objection. Defendants have retained possession of the shed belonging to the Plaintiffs by virtue of the fence and "no trespassing" signs which prevent removal by the Plaintiffs. Notice of approximately twenty days was given to Plaintiffs prior to erection of the fence which was insufficient time for Plaintiffs to move the shed. The Plaintiffs are entitled to retrieve their shed and the ramp to the shed. This may be difficult now that a fence has been erected, but we will grant a period of time for Plaintiffs to go onto Lot 14 and retrieve the shed and ramp. Defendants will have to work with Plaintiffs to do that in the easiest manner that can be accomplished. The money damages sought by Plaintiffs under the Replevin count are not appropriate in a replevin action and will not be awarded. A replevin claim allows someone to simply retrieve the item for which they have title. We also note that Defendants have not provided any cost estimate to remove the shed from Lot 14, and thus, no recoverable damages anyway.

20

G. Specific Performance –

Plaintiffs seek specific performance of the Agreement to purchase Lot 14. Specific performance is a proper remedy to convey title to real property for the terms of a contract where no adequate remedy at law exists and the other party violates the terms of the contract. Messina v. Silberstein, 528 A.2d 959 (Pa. Super. 1987). In this case, the parties had an installment Agreement of Sale for Plaintiffs to purchase Lot 14 on or before August 21, 2018. The Agreement had a time is of the essence clause. It also contained a clause that the Sellers (Defendants) could retain all sums paid by the Buyers (Plaintiffs) in the event of Plaintiffs' default. Plaintiffs failed to close on the purchase of Lot 14 on or before August 21, 2018. Defendants immediately sent a notice of default and terminated the Agreement.

Plaintiffs contend they remain ready, willing and able to purchase Lot 14 for the agreed upon price of the Agreement. However, they were unable to do so on or before August 21, 2018, the date required in the Agreement. In fact, Plaintiffs admitted they were unable to close in the time period required and sought a six month extension. This was a unilateral attempt to extend the Agreement beyond the expiration date for a closing. Defendants responded they were unwilling to do so. There was no evidence that Plaintiffs were ready, willing and able to close on the purchase on or before August 21, 2018, nor that Defendants defaulted under the Agreement. Therefore, the request for specific performance cannot be granted.

H. Breach of Contract –

Plaintiffs have essentially made two separate claims for breach of contract. The first is for the costs of repairs the Plaintiffs paid that Defendants had agreed to remediate prior to

21

closing on Lot 15 of $2,032. The other claim is for the monies paid to the Defendants by the Plaintiffs toward the purchase of Lot 14 which was $2,900 ($500 deposit plus $2,400 paid through August 18, 2018). For breach of contract, the following must be proven: 1) the existence of a contract; 2) a breach of duty imposed by the contract; 3) resulting damages. Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053 (Pa. Super. 1999). The statute of frauds requires that all contracts pertaining to the purchase of land be in writing. Brotman v. Brotman, 353 Pa. 570, 46 A.2d 175 (1946); Manley v. Manley, 238 Pa. Super. 196, 357 A.2d 641 (1976).

Here, Plaintiffs had an Agreement of Sale with Defendants to purchase Lot 14. That Agreement was in writing and had a time is of the essence clause. Plaintiffs made payments under the Agreement as required. Plaintiffs failed to close on or before August 21, 2018 as required by the Agreement. Defendants were not in default of that Agreement, and therefore, did not breach a contract. Plaintiffs were unable to close on or before the agreed upon closing date and Defendants terminated the Agreement. The language of the Agreement called for the Defendants to keep any monies paid by Plaintiffs. Therefore, Plaintiffs cannot recover the monies paid to Defendants under a theory of breach of contract regarding Lot 14.

Similarly, Plaintiffs cannot recover under a theory for breach of contract regarding the monies they paid for repair issues on Lot 15 which Defendants had originally agreed to address. Based upon the credible testimony of Mr. Galligan, the parties had agreed, at least verbally, to have the Sellers pay to pump the septic system, install a radon mitigation system and to shock the well water. A written addendum was prepared for those items, but never signed by the Defendants. The Defendants ultimately paid for the septic system to be pumped;

22

however, at closing on August 21, 2017, Defendants refused to pay for anything else.[2] Mr. Galligan ended by paying the cost to shock the well and Plaintiffs paid for the radon system ($1,100).

At closing, the parties chose to close without anything further in writing. Defendants never signed the written addendum. The Plaintiffs chose to close on Lot 15. The inspection contingency paragraph of the Agreement of Sale at paragraph 13 required a mutually acceptable written agreement concerning repair issues, and if not obtained, the Plaintiffs could terminate the agreement or move forward and purchase "as is" with a release pursuant to paragraph 28 of the agreement. By choosing to close without a written agreement on the repair issues, the Plaintiffs' claims were subject to the "as is" clause and release language of the Agreement, and cannot be reviewed now.

While we agree with Plaintiffs that they were in an untenable position at closing over the repair issues, the language of the Agreement controls. Those claims were released. As Mr. Galligan noted, in his 20+ years of experience it was rare that parties would fail to keep an oral promise to make repairs. It is particularly curious that Defendants only did so after learning the Plaintiffs had a "clear to close" from their lender whether or not the repairs were made. That left the Plaintiffs with no leverage at that point, short of cancelling the whole deal. It is disappointing when people refuse to honor their word and choose to lessen their integrity, but it

---

[2] Plaintiffs contend there was also an agreement to pay for carpenter bee remediation ($75), and that they incurred additional plumbing expenses related to the well, but we do not find evidence of this in the record. Mr. Galligan provided credible and convincing testimony of what was ultimately agreed to in the course of negotiations over inspection items.

is not actionable in this context. Therefore, Plaintiffs cannot recover on their breach of contract claims regarding the repair issues.

Plaintiffs also seek punitive damages and attorney's fees. An award of punitive damages requires a showing of willful, malicious conduct, or conduct so careless as to be a wanton disregard for others, or when a defendant acts with an evil motive. We find that while the Defendants' behavior in this case was egregious, it was not enough to rise to the level necessary for an award of punitive damages.

Plaintiffs have submitted a claim for attorney's fees in the amount of $13,165.94. *See* Plaintiffs' Exh. 25 and 26. This includes an estimated 6 hours at $243.75 per hour ($1,462.50) for trial. The imposition of attorney's fees is appropriate where it is provided for by statute, or contained in an agreement of the parties. We find that the clause "actual damages" under Section 7311 of the RESDL includes the ability to award attorney's fees. 68 Pa. C.S.A. Section 7311. Although not specified in the RESDL, there is no case law defining "actual damages," nor guidance regarding attorney's fees under this statute. Therefore, we find no prohibition to such an award under the RESDL as part of "actual damages." We find that attorney's fees to bring an action under the RESDL is an "actual damage" and corollary to the grounds under which the RESDL exists. Absent Defendants' conduct in violating the RESDL, the Plaintiffs would not have incurred attorney's fees to bring this action. We find no other authority under the other claims brought by Plaintiffs to award attorney's fees, but do so under the RESDL. We further find that the attorney's fees sought were the reasonable and necessary amount to bring the RESDL claim and were no more than necessary just because other causes of action were raised. The issues raised, the discovery taken, the preparation for trial and the trial

24

itself were inseparable from a claim only under the RESDL versus the other causes of action. Therefore, we will make an award for most of the attorney's fees sought except for the total time estimated for trial. The actual time for the trial was about three (3) hours, so we will mold the Plaintiffs' attorney's fees request to $12,434.69. ($13,165.94 less $731.25 representing three (3) hours at trial instead of six (6) hours). The amount of attorney's fees was reasonable and set forth sufficiently in Plaintiffs' Exhibits 25 and 26. This will be added to the other proven damages.

## COURT OF COMMON PLEAS OF MONROE COUNTY
## FORTY-THIRD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

ATTIKIS J. DAVIS and
KELLIE RAE DAVIS,

               Plaintiffs

      vs.

MICHAEL PANARELLA and
CHRISTINE A. PANARELLA,

          Defendants

: NO. 3649 CIVIL 2019
:
:
:
:
:
:
:
:
:
:
: NON-JURY TRIAL

## O R D E R

AND NOW, this 27ᵗʰ day of August, 2021, following a non-jury trial in this matter, it is ORDERED as follows:

1. The claim for Quiet Title/Adverse Possession is DENIED.

2. The claim under the Real Estate Sellers Disclosure Law ("RESDL") is GRANTED and Plaintiffs are awarded $2,900 in payments made for Lot 14, $972 for the ramp constructed to the shed and $18,500 as the cost to remove and repair the encroaching areas, all incurred as a result of the reliance on the Sellers' Disclosure Statement.

3. The claim for fraud is GRANTED. Plaintiffs are awarded the same damages as set forth under the claim for violation of the RESDL, without needing to be assessed separately at this time since they were already awarded in paragraph 2 herein.

26

4. The claim for Nuisance is DENIED.

5. The claim for Trespass is DENIED.

6. The claim for Replevin is GRANTED. Plaintiffs shall have ninety (90) days from the date this matter is deemed final to enter Defendants' Lot 14 and retrieve their shed and ramp in the easiest manner available. Defendants shall cooperate in that regard.

7. The claim for Specific Performance is DENIED.

8. The claims for breach of contract are DENIED.

9. The claim for punitive damages is DENIED.

10. The claim for attorney's fees is GRANTED. Plaintiff is awarded $12,434.69 in attorney's fees.

The total amount of monetary damages awarded to Plaintiffs and against Defendants is $34,806.69.

BY THE COURT:

DAVID J. WILLIAMSON, J.

cc:     Brett J. Riegel, Esq.
        David A. Martino, Esq.

DJW2021-066 Davis v Panarella 3649 CV 2019.docx

2021 AUG 27 P 12: 55 PROTHONOTARY MONROE COUNTY, PA

27